**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 06a0103n.06**
**Filed: February 9, 2006**

**No. 04-2171**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| SHERI L. KORNECKY, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

BEFORE: SILER and GRIFFIN, Circuit Judges, and KATZ, District Judge.[*]

PER CURIAM.

Sheri Kornecky applied for social security disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") under the Social Security Act ("SSA"), citing generalized anxiety and personality disorders, and the Commissioner of the Social Security Administration denied her application. The Commissioner agreed that Kornecky suffered from mental impairments, but found that they did not prevent her from performing simple, low-stress, repetitive work that did not involve much social interaction. He relied on a vocational expert's testimony that such jobs existed in significant numbers in the regional economy. Kornecky contends that the Commissioner erred in failing to consider the opinion of Dr. Lian, a psychiatrist whom she

---

[*]The Honorable David A. Katz, United States District Judge for the Northern District of Ohio, sitting by designation.

characterizes as a treating physician. The Commissioner responds that Lian was not a treating physician because he saw Kornecky only once, that he failed to adequately support his mental residual functional capacity ("RFC") assessment, and that his opinion was inconsistent with more well-supported opinions rendered by other sources. For the reasons that follow, we affirm.

I.

In order to qualify for SS benefits, Kornecky had to establish that she had a disability on or before her date last insured ("DLI"), June 30, 2001. The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A subjective allegation of disabling symptoms alone is insufficient; the claimant must substantiate the symptoms by objective clinical or lab findings.[1] *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001).

In Social Security Ruling ("SSR") 96-4p,[2] the SSA explained what is needed under the regulations to show a medically determinable impairment: "[a]lthough the regulations provide that the existence of a medically determinable physical or mental impairment must be established by

---

[1]"Laboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques" such as X-rays, electrocardiograms, electroencephalograms, chemical tests, and psychological tests. 20 C.F.R. § 404.1528(c).

[2]SSRs are binding on the SSA, 20 C.F.R. § 402.35(b)(1), but they do not have the force of law. As the agency's interpretation of its own regulations, however, a SSR "is entitled to substantial deference and will be upheld unless plainly erroneous or inconsistent with the regulation." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 549 (6th Cir. 2004) (citations omitted).

medical evidence consisting of signs, symptoms, and laboratory findings, the regulations further provide that under no circumstances may the existence of an impairment be established on the basis of symptoms alone." The ruling also explains the distinction between symptoms and signs: "symptoms . . . are an individual's own perception or description of the impact of his or her physical or mental impairment(s) . . . . [W]hen any of these manifestations is an anatomical, physiological, or psychological abnormality that can be shown by medically acceptable clinical diagnostic techniques, it represents a medical 'sign' rather than a 'symptom.'" SSR 96-4p n.2; *see also* 20 C.F.R. §§ 404.1528(a)-(b) & 416.928(a)-(b).

There is a five-step process to determine whether a claimant can perform substantial gainful work. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). The claimant bears the burden of proof in the first four steps; if she does so, the Commissioner bears the burden in the fifth. *Id.* (citation omitted). In step one, if the claimant is performing a substantial gainful activity, she is ineligible, regardless of her condition. 20 C.F.R. §§ 416.920(a)(4)(I) & (b).

In step two, the Commissioner considers the severity of the impairment. If the claimant does not have a medically determinable impairment or combination thereof that is "severe" and is expected to result in death or to last at least twelve months, she is not disabled. 20 C.F.R. §§ 416.920(a)(4)(ii) & (c). An impairment is severe if it limits the ability to do basic work activities such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, following instructions, using judgment, and responding appropriately to co-workers, supervisors, and usual workplace situations and changes. 20 C.F.R. § 416.921. Because

Kornecky claims multiple impairments, the Commissioner must consider whether their combined effect can be expected to be severe for at least twelve months. 20 C.F.R. § 416.922(b).

Mental impairments are evaluated in four functional areas: daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.[3] In the first three areas, the claimant's limitation is rated none, mild, moderate, marked, or extreme; episodes of decompensation are rated none, one or two, three, or four or more. 20 C.F.R. § 416.920a(c)(3)-(4).

In step three, the Commissioner again considers the severity of the impairments. If the impairment is at least as severe as one in the Listing of Impairments in Appendix 1 and is expected to result in death or to last at least twelve months, the claimant is disabled. 20 C.F.R. §§ 416.920(a)(4)(iii) & (d). If the findings about the impairment are not precisely listed in the regulations, the Commissioner considers whether "the medical findings are at least equal in severity and duration to the listed findings," comparing the "symptoms, signs, and laboratory findings about

---

[3]Decompensation is "[t]he appearance or exacerbation of a mental disorder due to failure of defense mechanisms." STEDMAN'S MEDICAL DICTIONARY 462 (27th ed. 2000) ("STEDMAN'S"). The regulations provide, "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in . . . maintaining concentration, persistence, or pace." 20 C.F.R., pt. 404, subpt. P, app. 1, § 12.00(C)(4).

The Railroad Retirement Act regulations provide a useful explanation of how decompensation manifests itself in a work setting. In the workplace, decompensation manifests as a "repeated failure to adapt to stressful circumstances which cause the individual either to withdraw from that situation or to experience exacerbation of signs or symptoms . . . with an accompanying difficulty in maintaining . . . concentration, persistence, or pace (i.e., deterioration which may include deterioration of adaptive behaviors). Stresses common to the work environment include decisions, attendance, schedules, completing tasks, interactions with supervisors, interactions with peers, etc." 20 C.F.R., pt. 220, app. 1, § 12.00(C)(4).

[the claimant's] impairment(s), as shown in the medical evidence . . . with the corresponding medical criteria shown for any listed impairment." 20 C.F.R. § 416.926(a).

If the claimant does not have a listed impairment at the requisite degree of severity, the Commissioner proceeds to step four. There the Commissioner compares the claimant's residual functional capacity ("RFC"), which is the most she can still do despite her limitations, to the physical and mental demands of her past relevant work. 20 C.F.R. §§ 416.920(f), 416.945(a)(1). In assessing RFC, the Commissioner considers statements by medical sources, whether or not they are based on a formal examination. The Commissioner will also consider observations about the claimant's impairments and limitations, including her pain, from the claimant, friends, relatives, neighbors or others. Lastly, the RFC assessment considers the limitations caused by *all* impairments, even those which were not severe. 20 C.F.R. § 416.945(a)(3).

When comparing RFC to past relevant work, the Commissioner considers only work done within the last fifteen years that was substantial gainful activity "and that lasted long enough for [her] to learn to do it." 20 C.F.R. § 416.960(b)(1). The Commissioner may consult a vocational expert ("VE") as to the demands of the past relevant work, either as performed by the claimant or as generally performed in the national economy, and may pose hypotheticals to the VE as to whether someone with the claimant's limitations can meet those demands. 20 C.F.R. § 416.960(b)(2).

If the claimant can still do her past relevant work, she is not disabled. 20 C.F.R. § 416.960(3). If the claimant cannot do her past relevant work, the Commissioner proceeds to step five, where he must show that the claimant's RFC, viewed in light of her age, education, training

and work experience, enables her to adjust to other "substantial gainful work which exists in the national economy, regardless of whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work." 42 U.S.C. § 423(d)(2)(A). The other work must exist "in significant numbers in the national economy," not necessarily in the claimant's region. 20 C.F.R. § 416.960(c)(1) & (2). "Isolated jobs that exist only in very limited numbers in relatively few locations outside of the [claimant's] region . . . are not considered 'work which exists in the national economy.'" 20 C.F.R. § 416.966(b). If the claimant can adjust to such other work, she is not disabled; if she cannot, she is disabled. 20 C.F.R. § 416.920(a)(4)(v) & (g)(1).

## II.

The district court's determination that substantial evidence supports the ALJ's decision is a legal conclusion that we review de novo. *Valley v. Comm'r of Soc. Sec.*, 427 F.3d 388, 390 (6th Cir. 2005) (citation omitted).

The district court was obligated to accord deference to the Commissioner's decision, as are we. The courts may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility. *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001) (citation omitted). "Under 42 U.S.C. § 405(g), the ALJ's findings are conclusive as long as they are supported by substantial evidence," *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001) (citation omitted), which means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept" as adequate to support a conclusion. *Id.* Notably, substantial evidence is *less than a preponderance of the evidence*. *Bell v. Comm'r of Soc. Sec.*, 105 F.3d 244, 246 (6th Cir. 1996) (citation omitted); *accord*

*Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005) (citation omitted). The Commissioner's determinations are not subject to reversal merely because there is substantial evidence in the record that would support the opposite conclusion. *Longworth*, 402 F.3d at 595 (citation omitted).

III.

In November 2000, forty-six-year-old Sheri Kornecky applied for DIB and SSI benefits. She alleged that she had been disabled since May 1996 due to emotional problems and stress. The state agency that determines disability for the Commissioner denied Kornecky's applications, and she obtained a hearing before an ALJ in July 2002. Kornecky was represented by counsel, and she and her brother testified. In April 2003, the ALJ found that Kornecky was not disabled. The ALJ found that although Kornecky had severe mental impairments, she could perform work that required only limited contact with the public and co-workers, was low in stress, and involved simple, repetitive tasks. The ALJ found that Kornecky's limitations prevented her from returning to her past work as a secretary, sales clerk, or photo lab clerk but did not prevent her from adjusting to work as a cleaner, laundry worker, or hand-packer, jobs that existed in significant numbers in the region. The SSA Appeals Council denied review, leaving the ALJ's decision as the Commissioner's final decision.

In September 2003, Kornecky appealed to the United States District Court for the Eastern District of Michigan. The district court entered final judgment affirming the denial of benefits on July 6, 2004, and Kornecky filed a notice of appeal in September 2004.

IV.

Kornecky completed high school, one year of college, and some clerical training. She has worked as a secretary, office manager, sales clerk, cleaning person, and photo lab technician and can type eighty-five words per minute. Her last position, as a secretary and office manager, ended in April 1999. Kornecky testified that she left jobs in 1995 and 1996 due to inappropriate conversation or harassment by her supervisor, co-workers, and customers, and was laid off from other jobs. She applied for work, but eventually stopped looking because she felt demeaned when she received no calls or offers.

According to Kornecky's December 2000 questionnaire, she lived with her mother and brother and did chores inside and outside the house – laundry, vacuuming, dusting, mopping, sweeping, washing dishes, taking care of the lawn, gardening, and trimming trees and bushes. She read, watched TV, crocheted clothing, and occasionally shopped for yarn or personal items. Kornecky's questionnaire stated that she would engage in other activities if she had more money. She reported having no friends but occasionally visiting her sister, nieces, and nephews.

Kornecky tried to avoid stressful situations; her adult daughter reported that Kornecky got along "fine" with family but was nervous in groups and avoided people whom she did not know. Anderson opined that Kornecky might get angry if she felt "harassed" but said that this did not happen often because Kornecky was able to set boundaries and avoid potentially stressful situations.

In 2001, Kornecky similarly reported her daily activities as washing dishes three times a day, vacuuming, bathing and dressing, taking out the trash and checking the yard for trash, making her bed, reading, crocheting, doing laundry, watching TV, and cleaning the house. She also reported

doing other activities less frequently than every day: watering plants, washing the windows, changing sheets, dusting, cutting the grass, cleaning the refrigerator, sweeping the porch, trimming trees and bushes, planting flowers, mopping, and cleaning up the cupboards. Kornecky occasionally attended appointments, visited family, visited friends, and did some babysitting.

At the ALJ hearing in July 2002, Kornecky described herself as cordial and polite but said she did not have the money to be more socially active. She reported feeling anxious, particularly about legal difficulties related to her failure to pay child support. Kornecky's brother said that she refused to obtain mental health treatment because she thought there was nothing wrong with her, and that she did things "either her way or no way at all" and did not trust people. Kornecky had told psychiatrists that her mother and brother were hypercritical and verbally abusive.

The medical evidence relating to Kornecky's mental impairments included case management and outpatient therapy records from the Michigan Psychiatric Association ("MPA Group"), where she was treated briefly in 2000 and again in 2002, and examination reports and opinions from four psychiatrists and psychologists: psychologist Charles McGinnis, Ph.D. (February 2001), psychiatrist Ronald Fine, M.D. (March 2001), psychologist Laura Morris, Ph.D. (January 2003), and psychiatrist T. Lian, M.D., and his physician's assistant Donna Merrill (March 2003).

A.      MPA Group Records

Beginning in April 2000, Kornecky visited social workers, therapists, and case managers at the MPA Group. In April 2000, Kornecky saw social worker Alison Hartman three times, complaining of isolation because she did not have a phone or a car and describing her living

environment as stressful. She reported that she cooked, read, played solitaire, and helped her mother

with yardwork and housework. Hartman observed agitated motor activity and pressured speech and

described Kornecky as "suspicious" and "domineering." Hartman's summary stated, "She states

her belief that she is reliable, responsible, energetic and enthusiastic, but projects most limitations

on others. Because of her limited insight and cognitive distortions, short term prognosis is guarded

and long-term prognosis is uncertain because it is unclear how entrenched her problems are."

Hartman diagnosed generalized anxiety disorder ("GAD")[4] and could not rule out post-

---

[4]One authoritative definition sets out six criteria for diagnosing GAD:

The essential feature of Generalized Anxiety Disorder is excessive anxiety and worry (apprehensive expectation), occurring more days than not for a period of at least 6 months, about a number of events or activities. (Criterion A). The individual finds it difficult to control the worry. (Criterion B). The anxiety and worry are accompanied by at least three additional symptoms from a list that includes restlessness, being easily fatigued, difficulty concentrating, irritability, muscle tension, and disturbed sleep . . . (Criterion C). The focus of the anxiety and worry is not confined to features of another Axis I disorder such as . . . Panic Disorder . . . Social Phobia . . . Obsessive-Compulsive Disorder . . . and the anxiety and worry do not occur exclusively during Posttraumatic Stress Disorder (Criterion D). Although individuals with [GAD] may not always identify the worries as "excessive," they report subjective distress due to constant worry, have difficulty controlling the worry, or experience related impairment in social, occupational, or other important areas of functioning (Criterion E). The disturbance is not due to the direct physiological effects of a substance (i.e., a drug of abuse, a medication, or toxin exposure) or a general medical condition and does not occur exclusively during a Mood Disorder, a Psychotic Disorder, or a Pervasive Developmental Disorder (Criterion F).

AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 472-73 (4th ed., Text Revision 2000) ("DSM-IV-TR").

traumatic stress disorder.[5]  She recommended at least three months of individual therapy to help

Kornecky develop self-esteem and autonomy, which would improve her chances of finding a job

and a place to live.  Kornecky attended eleven therapy sessions from April through July 2000, and

social workers opined that she had somewhat improved her self-worth.  Kornecky chose to

discontinue therapy.

About two years later, in July 2002, Kornecky re-established contact with MPA at the

request of her guardian ad litem,[6] who thought she needed mental-health services to deal with

paranoia and confusion.  Case manager Tammy Ewald gave Kornecky a Global Assessment of

---

[5]The essential feature of PTSD is the development of:

> characteristic symptoms following exposure to an extreme traumatic stressor
> involving direct personal experience of an event that involves actual or threatened
> death or serious injury, or other threat to one's physical integrity; or witnessing an
> event that involves death, injury, or a threat to the physical integrity of another
> person; or learning about unexpected or violent death, serious harm, or threat of
> death or injury experienced by a family member or other close associate (Criterion
> A1).  The person's response to the event must involve intense fear, helplessness, or
> horror . . . (Criterion A2).  The characteristic symptoms . . . include persistent
> reexperiencing of the traumatic event (Criterion B), persistent avoidance of stimuli
> associated with the trauma and numbing of general responsiveness (Criterion C), and
> persistent symptoms of increased arousal (Criterion D).  The full symptom picture
> must be present for more than 1 month (Criterion E), and the disturbance must cause
> clinically significant distress or impairment in social, occupational, or other
> important areas of functioning (Criterion F).

DSM-IV-TR at 463.

[6]On March 20, 2002, a Michigan state court for the 18th Judicial Circuit issued a consent
order that dismissed an order to show cause that was related to Kornecky's failure to pay child
support.  The judge wrote, "The Plaintiff agrees to appointment of a guardian *ad litem* to assist her
in any social security or disability claim."

Functioning ("GAF") [7] score of 40-45. Ewald also noted that Kornecky had a "sketchy and erratic history of emotional problems," tended to isolate herself, blamed others for all her problems, and refused to make changes to improve her situation.

Kornecky initially refused mental-health services but later called to schedule an appointment, stating that the judge at her SSI court hearing ordered her to receive mental health treatment. Between September and November 2002, Kornecky visited (1) social worker Ewald, with whom she discussed housing, transportation support, and a therapy referral, and (2) therapist Patricia Straney, with whom she discussed stress related to family and her home environment. Straney stated that Kornecky found her living environment stressful but declined help with moving to her own residence.

In January 2003, the MPA Group closed Kornecky's case after she cancelled an appointment and made no further contact with the group.

B.      Report of Psychologist McGinnis (Ph.D.)

---

[7]GAF is a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning. At the low end, GAF 1-10 indicates **"**[p]ersistent danger of severely hurting self or others (e.g., recurrent violence) or persistent inability to maintain minimal personal hygiene or serious suicidal act with clear expectation of death." DSM-IV-TR at 34 (boldface and capitalization omitted). At the high end, GAF 91-100 indicates "[s]uperior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms**.**" *Id.* (boldface omitted). A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning.

At the request of the state agency, psychologist Charles McGinnis, Ph.D., examined Kornecky in February 2001. Kornecky complained of anxiety and nervousness in stressful situations but said she got along "fine" with others and reported that she cleaned her house, crocheted, gardened, and watched TV. McGinnis described Kornecky as anxious and depressed, observing "pressured" speech and hand-wringing, but found no evidence of odd or illogical thoughts. Kornecky had good manners, was appropriately dressed, and evinced no delusional or psychotic thinking. McGinnis performed tests and found that Kornecky could repeat several numbers forwards and backwards, recall three objects after a lapse of time, identify several large cities and famous people, and perform a "serial-seven subtraction task" and other calculations largely correctly.

McGinnis diagnosed GAD and assigned a GAF score of 50 to 55. A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (capitalization and boldface omitted). GAF 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* (capitalization and boldface omitted).

C.     Report of Psychiatrist Fine (M.D.)

A month later, state agency psychiatrist Ronald Fine, M.D., reviewed the MPA Group's records and McGinnis's exam report. Fine did not examine Kornecky. Noting the earlier findings

of pressured speech, nervousness, hand-wringing and frequent worrying, Fine agreed with the diagnosis of GAD. Fine opined that Kornecky would not do well at complex or technical tasks and might have difficulty intensively interacting with the public. Nonetheless, he stated that Kornecky could learn, understand, remember and perform simple, rote tasks on a sustained basis.

D.     Report of Psychologist Morris (Ph.D.)

At the ALJ's request, Laura Morris, Ph.D., L.P., examined Kornecky in January 2003 and reviewed her social functioning and daily activities. Morris noted that Kornecky had little interest in social interaction and experienced conflict with her mother and brother. Morris also noted that Kornecky's daily activities included making beds, washing dishes, cleaning bathrooms, crocheting, doing puzzles and crafts, listening to music, and reading. Morris described Kornecky as polite and pleasant, but nervous and restless; her speech was "copious," she was difficult to redirect, and she was focused on herself. In tests, Kornecky repeated five digits forward and backward but could not remember items after a delay. She did subtract serial sevens from 100 and completed other calculations correctly, and she was able to identify large cities, famous people, and current events.

Morris administered a personality test, which revealed that Kornecky suffered from chronic anxiety, tension, and worry that interfered with general functioning; lacked true assertive qualities and abilities but tended to be argumentative, demanding, and resentful when things did not go her way or when she felt threatened. Morris diagnosed GAD, dysthymic disorder, and personality

disorder[8] not-otherwise-specified with borderline and paranoid personality traits. Morris gave

Kornecky a GAF score of 52, in the same 50-55 range as McGinnis's exam two years earlier.

Like Fine, Morris opined that Kornecky could understand, remember, and carry out

instructions and make simple work-related decisions. Morris stated that Kornecky's ability to

interact appropriately with supervisors and co-workers and respond to routine changes in a work

setting was "slightly restricted" and her ability to interact appropriately with the public and respond

appropriately to work pressures was "moderately limited."

E. Report of Psychiatrist Lian (M.D.) and Physician's Assistant Merrill

Two months later, in March 2003, psychiatrist T. Lian, M.D., and physician's assistant

Donna Merrill examined Kornecky at the request of her attorney. Kornecky again reported stress

related to her living situation. Lian apparently did not ask Kornecky about her daily activities. Lian

and Merrill observed that Kornecky was sad and angry, exhibited "slightly pressured" speech and

repetitive thoughts, and was defensive and self-centered. Kornecky was appropriately dressed, alert,

oriented, and denied hallucinations or delusions. Lian diagnosed major depressive disorder, GAD,

and personality disorder. They also could not rule out paranoid personality disorder or organic brain

---

[8]"The essential feature of Dysthymic Disorder is a chronically depressed mood that occurs for most of the day more days than not for at least 2 years (Criterion A). . . . . During periods of depressed mood, at least two of the following additional symptoms are present: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration or difficulty making decisions, and feelings of hopelessness (Criterion B)." DSM-IV-TR at 376-77. Personality disorder is "an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, has an onset in adolescence or early adulthood, is stable over time, and leads to distress or impairment." *Id.* at 685.

syndrome[9] related to an unspecified head injury. Lian gave Kornecky a GAF 46 and recommended that she resume outpatient therapy and consider taking psychotropic medication.

After the exam, Lian and Merrill completed a mental RFC assessment, concluding that she was "markedly limited" in seven of twenty areas of mental functioning, namely the ability to:

- maintain attention and concentration for extended periods;
- complete a normal workday and work week without interruptions from psychologically-based symptoms;
- interact appropriately with the public;
- accept instructions and respond appropriately to criticism from supervisors;
- get along with co-workers and peers;
- maintain socially appropriate behavior;
- set realistic goals.

Merrill commented that Kornecky had significant anxiety, depression and paranoid features, lacked insight into her stressors, had a labile (i.e. widely fluctuating) mood, and "clearly has issues from her past that continue to impede her progress."

F.      Testimony of Vocational Expert

The ALJ asked vocational expert Tim Shaner to posit someone of Kornecky's age, education, and work experience who could perform simple, low-stress repetitive work that involved limited contact with the public and with co-workers. Shaner testified that such a person could work as a cleaner, laundry worker, hand-packer, machine operator, and assembler, and the ALJ found that there were over 90,000 such positions in the regional economy.

---

[9]Organic brain syndrome is characterized by "a constellation of behavioral or psychological signs and symptoms including problems with attention, concentration, memory, confusion, anxiety, and depression caused by transient or permanent dysfunction of the brain." STEDMAN'S at 1762.

V.

Kornecky contends that the ALJ committed reversible error when he failed to evaluate or discuss the psychiatric evaluation and mental RFC assessment done by Lian and Merrill. Kornecky relies on regulations in Title 20 C.F.R. that set forth what evidence the Commissioner will consider and how he will determine the weight to accord that evidence, including:

§ 404.1520(a)(1), which states that the purpose of section 1520 is to set forth the five-step sequential process for determining disability;

§ 404.1527(a)(2), which defines medical opinions;

§ 404.1527(b), which states, "[i]n deciding whether you are disabled, *we will always consider the medical opinions in your case record* together with the rest of the relevant evidence we receive."

§ 404.1527(c), which states, "After we review *all of the evidence* relevant to your claim, including medical opinions, we make findings . . . ."

§ 404.1527(d), which states in part, "[r]egardless of its source, *we will evaluate every medical opinion we receive.*"

§ 404.1528(b), which defines "signs" as "anatomical, physiological or psychological abnormalities which can be observed, apart from your statements (symptoms)" and defines a psychiatric sign as a "medically demonstrable phenomena that indicate specific . . . abnormalities of behavior, mood, thought, memory, orientation, development, or perception."

§ 404.1545(c), which states, "[w]hen we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your [RFC] for work activity on a regular and continuous basis."

§ 404.1545(e), which states, "[w]e will consider the limiting effects of all your impairment(s), even those that are not severe, in determining your [RFC]."

(Emphasis added.)

Kornecky characterizes Lian as a treating physician, but this characterization is not persuasive. A treating physician is "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you with medical treatment or evaluation and *who has, or has had, an ongoing treatment relationship with you*." 20 C.F.R. § 404.1502 (emphasis added). Kornecky asserts that Lian's single exam should qualify him as a treating physician because "this examination was only three weeks prior to the time the ALJ rendered his decision and therefore is too early for the reviewing court to characterize whether or not it is an opinion of a treating physician." But the relevant inquiry is not whether Lian might have become a treating physician in the future if Kornecky had visited him again. The question is whether Lian had the ongoing relationship with Kornecky to qualify as a treating physician *at the time he rendered his opinion*.

Moreover, Kornecky points to nothing that prevented her from visiting a single psychiatrist or psychologist multiple times early enough for that source to qualify as a treating source by the time of her application, or by the time of the hearing. Likewise, Kornecky points to nothing that prevented her from visiting Lian regularly after their one visit, which might have rendered Lian a treating source before the ALJ's decision. Then Kornecky could have asked the ALJ to supplement the record with an opinion from Lian that was based on those subsequent visits.

Accordingly, we conclude that given the nature and prolonged course of Kornecky's mental difficulties, a single examination did not suffice to render Lian a treating physician.[10] "The treating

---

[10]Kornecky seems to claim she visited Lian after the March 2003 visit that is documented in the record: "Additionally militating towards the [application?] of the treating source rule is [the] fact [that] Ms. Kornecky did return for regular treatment." The record, however, contains no

physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once . . . ." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) ("Dr. Ruff examined Mr. Barker on only one occasion, and the rationale of the treating physician doctrine simply does not apply here.").

Kornecky cites no authority where a federal court has found a source to be a treating source after only one visit. However, a plethora of decisions unanimously hold that a single visit does not constitute an ongoing treatment relationship. *See, e.g., White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005) (occupational medicine specialist who evaluated claimant only once was not a treating physician). Indeed, depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship. *See, e.g., Cunningham v. Shalala*, 880 F. Supp. 537, 551 (N.D. Ill. 1995) (where physician saw claimant five times in two years, it was "hardly a foregone conclusion" that his opinion should be afforded great weight).

Kornecky relies on *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004), for the proposition that the ALJ committed reversible error by failing to articulate his reasons for rejecting Lian's opinion. This reliance is misplaced. In *Wilson*, *the treating physician* stated that there were great restrictions on the claimant's ability to work since 1993, i.e. including the insured period. *Id.* at 545. The ALJ summarily dismissed that opinion and found lesser restrictions on the claimant's

---

evidence of any such subsequent visits, and Kornecky does not specify when they took place or what examination, diagnosis, prescription, or treatment resulted. In any event, visits to Lian *after* his RFC assessment could not retroactively render him a treating physician at the time of the assessment.

ability to work. The ALJ stated only that he had "considered" the treating physician's opinion and that while "this opinion may be an accurate assessment of [Wilson's] current limitations, the undersigned must assess the claimant's limitations on March 31, 1995, the date he was last insured for benefits." *Id.*

The Commissioner argued, and the district court agreed, that the ALJ's misinterpretation of Wilson's treating physician's opinion was harmless because the ALJ "could have" relied on other substantial record evidence to the contrary – namely, the claimant's own testimony and the opinions of two consulting physicians. *Id.* at 546.

This court reversed, citing 20 C.F.R. §404.1527(d)(2). That regulation requires an ALJ to give controlling weight to *a treating physician's* opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." *Id.* The regulation also guarantees claimants that the agency will "always give good reasons" for how much weight it accords the treating physician's opinion. 20 C.F.R. §404.1527(d)(2). Because a federal agency is obligated to follow its own regulations, and because that regulation confers a procedural protection on disability claimants, the ALJ's failure to give good reasons for rejecting Wilson's treating physician's opinion could not be harmless error. *Wilson*, 378 F.3d at 547-48.

Here, by contrast, the ALJ neither misstated nor ignored a treating physician's opinion; he merely failed to explain why he favored several examining physicians' opinions over another's. The regulation at issue in *Wilson* simply does not apply, and there is no reason to depart from the usual

harmless-error rule. *See generally* 5 U.S.C. § 706 (when a court determines whether agency action was lawful, "due account shall be taken of the rule of prejudicial error"); *see, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001) (refusal to even acknowledge the opinion of a treating physician was harmless error, because physician provided no objective basis for his conclusions and his opinion was contradicted by the weight of the other evidence).

No purpose would be served by remanding for the ALJ to explicitly address the shortcomings of Lian's opinion and the evidence and methods underlying it. *Cf. Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) (citation omitted) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result."). While it might be ideal for an ALJ to articulate his reasons for crediting or discrediting each medical opinion, it is well settled that:

> [a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party. Nor must an ALJ make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts.

*Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999) (citations and internal quotation marks omitted).

Given our finding that Lian was merely an examining physician, his opinion was not entitled to the presumptive weight accorded a treating physician's opinion. In turn, the ALJ was not obligated to agree with Kornecky's belief that the Lian report was "the most critical" of all the opinions in the record. The regulations provide:

(d)  . . .  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion:

(1)  Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not . . . .

(2)  Treatment relationship.  Generally, we give more weight to opinions from your treating sources . . . .

. . . .

(3) Supportability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion.  Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.  We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) Other factors.  When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion.

20 C.F.R. § 404.1527(d)(1)-(6).

Applying this standard, the ALJ reasonably found that Lian's opinion was not as well supported as the other medical opinions, and that his assessment of Kornecky's limitations was not consistent with the record as a whole.  *See* 20 C.F.R. § 404.1527(d)(3)-(4).  As the district court

noted, Lian's assistant "Merrill provides a terse one paragraph conclusion concerning Plaintiff's psychological problems. There is a dearth of discussion pertaining to why Plaintiff was evaluated as she was for any given category. . . . Dr. Lian does not adequately set forth the reasons to support his conclusory assessment of Plaintiff's mental health." A review of the Lian report reveals that neither Lian nor Merrill purports to explain how their exam findings led to their RFC assessment.

In contrast to Lian's examination, the regulations provide that a comprehensive mental status examination "generally includes a narrative description of [the claimant's] appearance, behavior, and speech; thought process (e.g., loosening of associations); thought content (e.g., delusions); perceptual abnormalities (e.g., hallucinations); mood and affect (e.g., depression, mania); sensorium and cognition (e.g., orientation, recall, memory, concentration, fund of information, and intelligence); and judgment and insight." 20 C.F.R. part 404, subpart P, app. 1, § 12.00(D)(4) ("Mental status examination").

Lian's assessment of Kornecky's social functioning was limited to a discussion of her relationship with her mother; he did not test Kornecky's memory or concentration and did not ask about her daily activities. Lian opined that Kornecky would have moderate difficulty carrying out even simple one- or two-step instructions, but his only direct observation of her cognitive abilities was that she was alert and oriented. He claimed Kornecky's ability to concentrate for extended periods was "markedly limited," yet he provided no observation of, or discussion with, Kornecky to support this assertion. Lian also claimed that Kornecky had a "markedly impaired" ability to

maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, but he did not observe any inappropriate behavior and described her appearance as appropriate.

Thus, Lian's opinion runs afoul of the rule that the ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Buxton*, 246 F.3d at 773 (citation omitted).

In contrast, Morris and McGinnis made more detailed observations of Kornecky's attitude, behavior, stream of mental activity, thought content, and emotional reactions. Morris's December 2002 Mental Status Report described Kornecky as follows:

> Social Functioning**:**
> Sheri is not very much interested in social interactions at this point. However, she said that she will visit with other people if they drop by her home, but makes no effort to really go out and see others. During this evaluation Sheri appeared to be a person who tended to compulsively overwork topics and seemed to be focused on expressing excessive attention to details which made it difficult for her to grasp on [sic] the larger issue at hand.
>
> . . . .
>
> General Observations**:**
> Sheri came to this appointment with her sister. They were on time. They denied having any trouble finding this location. Sheri presented as a slim woman but not undernourished. Her gait and posture were normal. Sheri was polite but obsessed over details. She presented as nervous, outwardly restless, and spoke of how dysfunctional her current situation is, meaning that she's living with her mother and brother.
>
> Mental Status:
> Attitude and Behavior**:**
> Sheri was pleasant but difficult to redirect as she often went off on tangents. She seemed, throughout this assessment, to be overly focused on herself. . . . Her speech was copious and over detailed. Sheri talked a lot with her hands, meaning that she was very animated with hand gestures. She tended to be very outwardly focused on blaming others for her problems.

. . . .

Stream of Mental Activity**:**
Sheri was certainly spontaneous and went on tangents, but stayed on topic.  At times she had a difficult time to find words to express herself and would often pause and collect herself and then would continue to speak.

Mental Trend/ Thought Content**:**
Sheri denied hallucinations, delusions, persecutory trends, although she reports herself as perfectionistic.  Obsessive behaviors were denied.  She denied thoughts controlled by others and unusual powers.  In terms of worthlessness, she does report having these types of feelings.  When asked about being suicidal she said that that's nothing that has occurred to her.

. . . .

Emotional Reaction**:**
. . . . Sheri appears to be a very reactive lady, one who is easily excitable, defensive, and emotionally labile.

. . . .

Prognosis**:**
Sheri appears to have a characteristic way of relating to the world which appears to be antagonistic.  She also appears to be a woman who is quite insecure and unsure of herself.  For these reasons, prognosis is poor.

(Boldface omitted.)  Morris's Psychological Assessment, also done in December 2002, opined that

Kornecky's habit of becoming "very demanding and argumentative and resentful when things don't

go her way or when she feels threatened" alienated other people.

Ultimately, Morris found that Kornecky's personality and behavior would moderately restrict

her ability to interact appropriately with the public and to respond appropriately to work pressures.

Significantly, however, Morris found *no* restriction on Kornecky's ability to understand, remember

and carry out short, simple instructions and even *detailed* instructions, nor did Morris find any

restriction on Kornecky's ability to make judgments on simple work-related matters.  Morris found

only slight restrictions on Kornecky's ability to interact appropriately with supervisors and co-workers and to respond appropriately to changes in a routine work setting.

Kornecky contends that Morris's narrative evaluation contradicts her RFC assessment. Perhaps Morris's exam findings could support a more pessimistic RFC. But we cannot say as a matter of law that Morris's RFC analysis conflicted with her findings (i.e. was internally inconsistent) or was otherwise not worthy of credence.

For his part, Dr. Fine also found that Kornecky was moderately limited in her ability to interact appropriately with the general public, but that she was not significantly limited in her ability to understand, remember and carry out short, simple instructions, perform an ordinary routine without special supervision, make simple work-related decisions, and respond appropriately to changes in the work setting. Consistent with these findings, Fine opined that while Kornecky "would not do well" at complex or technical tasks, she could perform simple rote tasks on a sustained basis without intensive interaction with the public. Dr. McGinnis found that Kornecky had "good contact with reality," normal motor activity except for hand-wringing, and had pressured speech but no odd or illogical thoughts, no delusions, and no other psychotic trends.

Kornecky provides no basis for us to conclude that these physicians' techniques were methodologically unsound, that their conclusions were illogical based on their exam findings, or that their assessments could not reasonably be credited by the ALJ on the whole record.

Kornecky points to the fact that Lian and MPA case manager Ewald assigned GAF scores of 46 and 40-45, respectively, reflecting their opinion that Kornecky had "serious symptoms" or a

"serious impairment" in social or occupational functioning. For five reasons, however, these low GAF scores fail to show that the ALJ's decision was not supported by substantial evidence.

First, given the inadequate explanation for Lian's mental RFC assessment, the ALJ could properly find Lian generally to be not credible or reliable. Lacking confidence in Lian's opinions, the ALJ could place more stock in GAF scores assigned by other medical sources. As to Ewald, she had a bachelor's degree in social work and SWT ("Social Work Technician") and CSM ("Client Service Manager") degrees or certifications, so the ALJ could properly give less weight to her assessment than those of psychiatrists or psychologists who had earned an M.D., Ph.D. or Psy.D. *See Duncan v. Barnhart*, 368 F.3d 820, 823 (8th Cir. 2004) (citation omitted) (in determining how much weight to give a medical opinion, one factor is the degree of specialization).

Second, McGinnis and Morris both assessed Kornecky's GAF a bit more positively, 50-55 and 52, respectively. While those scores still reflect mental problems, a 51-60 indicates moderate symptoms or moderate difficulty in social or occupational functioning, rather than the more serious symptoms or difficulty in functioning suggested by a score in the 40s. DSM-IV-TR at 34.

Third, according to the DSM's explanation of the GAF scale, a score may have little or no bearing on the subject's social and occupational functioning. A 41-50 reflects the assessor's opinion that the subject has serious symptoms *or* serious impairment of social or occupational functioning. Likewise, a 51-60 reflects the opinion that the subject has moderate symptoms *or* moderate impairment of social or occupational functioning. *Cf. Quaite v. Barnhart*, 312 F. Supp. 2d 1195, 1200 (E.D. Mo. 2004) (citation omitted) ("In the absence of any evidence indicating that Dr.

Leonberger assigned this GAF score [50] because he perceived an impairment in plaintiff's ability to work, the score, standing alone, does not establish an impairment seriously interfering with plaintiff's ability to perform basic work activities."). Moreover, McGinnis and Morris did not accompany their relatively low GAF scores with any suggestion that Kornecky was unable to do any work.

Fourth, we are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place. *See, e.g., Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) (ALJ's failure to refer to GAF score did not make his RFC analysis unreliable).

If other substantial evidence (such as the extent of the claimant's daily activities) supports the conclusion that she is not disabled, the court may not disturb the denial of benefits to a claimant whose GAF score is as low as Kornecky's or even lower. *See, e.g., Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469 (6th Cir. 2003) (claimant had 55 GAF but said she was able to drive daughter to school and pick her up each day and maintained a regular schedule).

Fifth, even if the ALJ placed some weight on Kornecky's GAF scores, any tendency they had to suggest that Kornecky could not work was countered by the vocational expert's testimony that someone with her limitations could still do certain widely available work.

Kornecky claims that a Michigan state court appointed a guardian ad litem ("GAL") to represent her because of her mental problems. This argument is unfounded and misleading. The record contains only one item related to the appointment of a GAL: in March 2002, a state court

issued a consent order that dismissed an order to show cause related to Kornecky's failure to pay child support. The judge wrote, "[t]he Plaintiff agrees to appointment of a [GAL] to assist her in any social security or disability claim." The order did not suggest that Kornecky is incompetent because of delusions or otherwise. The only logical inference is that the court appointed the GAL to help Kornecky secure income from which she could meet at least part of her child support obligations.

Kornecky also refers to a notation made by Lian's physician's assistant, "Delusional? [counsel] Mr. Seward mentioned this – in appeal for SSI?? She knows for a fact that she can receive SSI – ??" This vague and unexplained notation cannot remotely be construed as a diagnosis of a delusional state. This is particularly true given that Merrill's notes from the very same examination record Kornecky as saying, "'I am burned out' – *denies voices, delusions . . . .*"

Lastly, Kornecky's counsel's opinion that she is delusional is not competent evidence.

VI.

"A judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary [is] lacking." *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994) (citation omitted). Kornecky's proof of disability was far from overwhelming and there was substantial evidence and medical opinion to the contrary. Accordingly, we affirm the denial of benefits.