NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0811n.06

No. 12-6136

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Sep 05, 2013
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| JERRY T. RUDD, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| COMMISSIONER OF SOCIAL | ) | DISTRICT OF KENTUCKY |
| SECURITY, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

BEFORE: BOGGS and SUHRHEINRICH, Circuit Judges, and MURPHY[*], District Judge.

SUHRHEINRICH, Circuit Judge. Plaintiff-Appellant Jerry T. Rudd ("Rudd") appeals the denial of his Title II insured disability and Title XVI supplemental security disability claims pursuant to 42 U.S.C. § 405(g) and 28 U.S.C. § 1291. We affirm.

## I. Background

Rudd last met the insured status requirements for disability benefits on December 31, 2008.

### A. Prior Decision

Rudd previously filed applications for a period of disability, disability insurance benefits (DIB), and supplemental security income (SSI), on June 27, 2005. An ALJ (the "prior ALJ") denied these claims on June 25, 2007, finding Rudd not disabled from June 1, 2003, through June 25, 2007.

---

[*]The Honorable Stephen J. Murphy, III, United States District Judge for the Eastern District of Michigan sitting by designation.

-1-

The prior ALJ found that Rudd had severe impairments cognitive and adjustment disorders. The prior ALJ also noted that Rudd had suffered various physical injuries from an April 2002 motor vehicle accident, and that in July 2005, he had surgery on his right knee. The prior ALJ found Rudd had residual functional capacity ("RFC") for sedentary work, except that he should avoid kneeling, crawling, using his lower extremities, and exposure to weather extremes. The prior ALJ also found that Rudd was "unable to carry out detailed instructions, make complex decisions and work with the general public." The prior ALJ recommended that Rudd "avoid fast paced work, and [be] limited to simple, repetitive, non-quota tasks."

## B. Evidence

Rudd filed the current applications for insured and SSI-disability benefits on October 10, 2007. The ALJ considered the following medical evidence. Rudd received mental health treatment from Four Rivers Behavioral Health ("Four Rivers"), from February 2007 through March 2008. On March 21, 2007, Rudd was diagnosed with Depressive Disorder, and he had a Global Assessment Functioning ("GAF") of 55.[1] In July 2007, Rudd was alert and oriented, but had a depressed mood and a GAF of 60. In September and October 2007, Rudd had "a pleasant affect." Rudd reported that he was not drinking alcohol and that he was looking for a job. He denied being depressed. At subsequent visits Rudd had a pleasant affect and his overall mental status improved. The examiner confirmed that Rudd was responding well to medication and reported Rudd's mood as "euthymic"

---

[1]A GAF score indicates an individual's overall level of functioning. 100 is the highest score, and higher scores indicate a higher level of functioning. A score of 51 to 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional pain and attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, inability to keep a job). DSM-IV-TR, p. 34.

or normal. At his final visit on March 4, 2008, Rudd was "doing well on his medications," his mood and affect were normal, his sleep had significantly improved, and his energy level had improved.

On November 5, 2007, Rudd visited the office of Danny Butler, M.D., complaining of "moderate pain in hands, low back, bilateral legs and ankles for the last 2 years which occurs intermittently." Rudd also reported that he had a closed head injury, that his left little finger had been reattached, and that he had undergone right leg and bilateral ankle repair due to a motor-vehicle accident. Jeffrey Ward[1] ("Ward") found that Rudd had pain with palpation to his right knee and lumbar spine, as well as to his first finger. Rudd was taking Trazodone and Tylenol, and received prescriptions for Naprosyn and Ultram.[2]

On December 5, 2007, Rudd complained of arthralgia (joint pain) and Ward refilled his medications. Ward observed evidence of decreased lumbar range of motion. Ward directed Rudd to follow up in four months. On April 21, 2008, Rudd reported moderate intermittent joint pain. Ward reported evidence of sensory deficits and weakness, a guarded gait, and decreased hand range of motion. Ward told Rudd to follow up with him in three months.

On April 21, 2008, Rudd's hands and lumbar spine were x-rayed. The radiology report indicated that Rudd's left hand x-ray showed a probable old fracture and old trauma respectively on the fourth and fifth fingers, but no acute pathology, no significant deformity, and no acute arthritic changes. The lumbar spine x-ray showed good alignment and position, no obvious fracture or defect, no definite significant disc-space narrowing, and no acute lumbar pathology.

[1]Ward worked in Dr. Butler's office. Rudd claims that he is a physician's assistant, but his qualifications are not clear from the record.

[2]Trazodone is used for mental health symptoms. Naprosyn and Ultram are used for pain.

On July 22, 2008, Rudd complained of moderate numbness in his left hand and intermittent left shoulder pain. Ward noted that Rudd had evidence of decreased range of motion in his cervical spine with some left side tenderness and pain with palpation. Ward reviewed Rudd's medication and instructed him to follow up in three months. The record does not reflect any further treatments with Ward. In April 2010, Rudd reported that he took only over-the-counter medication, and also stated that he was "unable to afford treatment or prescribed medications."

In April 2009, Dr. Butler gave an assessment of Rudd's ability to do work-related activities on a day-to-day basis. Dr. Butler opined that Rudd could occasionally lift and carry up to twenty pounds, but could not frequently lift or carry any weight. Dr. Butler indicated that Rudd was limited to one hour of standing and could sit an average of four hours in an eight-hour day. Dr. Butler noted that Rudd was limited to a few low steps or ramps but no other climbing, and was also "[l]imited to sporadic gross handling of easily manipulated items that [could] be handled in comfortable positions." Dr. Butler also found environmental restrictions, except as to noise. If accepted, Dr. Butler's findings would have required a finding of disability because they did not allow for any full-time, eight-hour workday.

On July 9, 2008, Diosdado Irlandez, M.D., a state agency physician, opined that Rudd could occasionally lift up to twenty pounds, frequently lift and carry ten pounds, stand and/or walk at least two hours and sit about six hours in an eight-hour workday. Dr. Irlandez noted that "[t]he prior RFC of 02/26/2008 is affirmed. The new evidence received has been reviewed and does not significantly alter the initial assessment." State agency psychologist Dan Vandivier, Ph.D., opined on February 21, 2008, that Rudd could understand and remember simple instructions, sustain

concentration, effort, and pace for simple tasks, interact with supervisors and peers, but not with the public, and could adequately adapt to situational conditions and changes.

Rudd also met with Bruce Amble, Ph.D., at his attorney's request on May 14, 2009. Dr. Amble made some general observations that Rudd's "[g]ait and posture appeared to be independent," and that he made some adjustments while sitting, as if in discomfort. Dr. Amble found that Rudd showed "a cooperative and friendly attitude," and that he was "responsive, polite and compliant." Dr. Amble opined that Rudd would have generally serious limitations with work activities.

Rudd testified at hearings held on April 7, 2009, and April 19, 2010. Rudd stated that he lived with his father and younger brother. He said that he was capable of bathing and dressing himself (except washing his feet), and attempted to do his own laundry. Rudd stated that he did not shop and avoided social activities. Rudd reported that he needed a cane to walk and that he could only walk up to twenty-five minutes or sit about five minutes at a time. Rudd said that he could lift fifteen to twenty pounds.

At the April 2010 hearing, psychological expert Tom Wagner, Ph.D., also testified. Dr. Wagner concluded that the record as a whole demonstrated that Rudd had mild limitations of activities of daily living, moderate limitations of social functioning and concentration, persistence and pace, and no episodes of decompensation. Dr. Wagner said Rudd needed verbal instructions, had slight limitations in his ability to carry out simple work related adjustments, deal with coworkers, and understand, remember and carry out simple work instructions. Dr. Wagner assessed moderate limitations in Rudd's ability to deal with the public, supervisors, and work pressures, and a moderate to marked limitation in the ability to understand, remember, and carry out detailed work instructions. Dr. Wagner stated that the level of limitation Dr. Amble found was not consistent with

Rudd's GAF of 55 to 60. Dr. Wagner acknowledged that the inconsistency between Dr. Amble's notes and the treatment notes could be explained by the gap between Rudd's last mental-health treatment and Dr. Amble's evaluation, but nonetheless agreed with the ALJ that his treatment at Four Rivers was successful and Rudd was doing well.

An impartial vocational expert ("VE") testified at the April 2010 hearing. The VE testified that Rudd had past work as a lube tech, classified as medium, and a cook, classified as a light job. When asked to consider if Rudd had the RFC to perform light work with the mental restrictions indicated by Dr. Wagner's testimony, the VE testified that Rudd could perform his past work as a cook. When asked if other jobs exist that Rudd could perform, considering his past work, age, marginal education and the same RFC, the VE responded that there would be a variety of unskilled jobs Rudd could perform, such as a bagger, modeling line attendant, and laundry worker. When asked whether jobs would exist if Rudd were limited to sedentary work with the same non-exertional limitations, the VE testified that there were a limited number of sedentary jobs such as semi-conductor bonder, inspector, and wafer breaker.

### C. The ALJ's Decision

The ALJ determined that Rudd had not engaged in substantial gainful activity since his alleged onset date, June 26, 2007 and that Rudd had severe impairments, including a history of injuries sustained in a 2002 motor-vehicle accident, a history of a July 2005 knee injury, status-post open reduction and internal fixation, borderline intellectual functioning, dysthymia, personality disorder, and a history of substance abuse with no evidence of recent abuse. The ALJ found that these impairments, alone or in combination, did not meet or medically equal an impairments in the Listings of Impairments. The ALJ found that Rudd could lift and carry up to twenty pounds

occasionally and ten pounds frequently, and sit, stand and/or walk six hours each in an eight-hour workday with normal rest and meal breaks every two hours. The ALJ found that Rudd did not have significant postural, environmental, manipulative, or communicative limitations. Regarding Rudd's mental limitations, the ALJ made findings consistent with Dr. Wagner's testimony. The ALJ recognized that the previous ALJ had found Rudd could perform only unskilled sedentary jobs, but found that the evidence demonstrated that since that decision, Rudd had "regained a higher level of physical functioning" such that he could perform light work. The ALJ also noted that the mental-health treatment records showed that Rudd's mental-health status had improved since the prior final decision. The ALJ found that Rudd could perform his past relevant light work as a cook, and therefore concluded that Rudd was not disabled.

The ALJ made an alternative finding that, even if Rudd were limited to unskilled, sedentary jobs, and considering his age, education, work experience, and RFC, there were jobs in significant numbers that he could perform. The ALJ made this finding based on the prior ALJ's decision, essentially concluding that even if she were bound by the prior ALJ's decision as to Rudd's RFC, he could still perform a significant number of jobs in the economy.

The Social Security Appeals Council denied review of the ALJ's decision, and Rudd appealed to the district court. The district court summarily adopted a magistrate judge's report and recommendation that Rudd's claim be denied.

### D. The District Court's Decision

The magistrate judge held that the ALJ had "a substantial basis" for concluding that improvement had occurred and that she was therefore entitled to re-evaluate Rudd's physical RFC. *See Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997). The magistrate judge held that

-7-

the ALJ erred in finding that Rudd could perform light work because "no medical opinion in the administrative record" supported such a finding, but the error was harmless in light of the ALJ's alternative ruling that Rudd could perform sedentary work. The magistrate judge held that the ALJ did not err in not giving Dr. Butler's opinion controlling weight, because Rudd was never seen by Dr. Butler, only by Ward. Although the magistrate judge was "uncomfortable" with the ALJ's suggestion that nurse practitioners or physician assistants are not "acceptable medical sources" for purposes of weighing medical opinions, the record supported the ALJ's conclusion that Dr. Butler's opinion was not supported "by sufficiently-detailed objective medical data" and "was inconsistent with other substantial evidence." The magistrate judge also found that the ALJ did not err in relying on Dr. Wagner's testimony over that of Dr. Amble's, since Dr. Amble had only examined Rudd one time, and Dr. Wagner had access to Rudd's entire medical record and explained the bases for his disagreement with Dr. Amble's diagnoses.

The magistrate judge also found that the ALJ's RFC was not inadequate for failing to address "each function on a function-by-function basis" including manipulative limitations as required by SSR 96-8p based on injuries to his left hand, concluding that Rudd failed to show that a more detailed function-by-function articulation of his RFC would have changed the ALJ's decision. Further, Rudd did not show that he had manipulative limitations on his left hand that would prevent him from performing jobs identified by the VE.

The magistrate judge also held that the vocational hypotheticals submitted by the ALJ were adequate even though they did not explicitly address the ALJ's finding that Rudd requires normal rest and meal breaks every two hours because "such breaks are normal and assumed to be present in most jobs." The magistrate judge noted that the ALJ acknowledged the prior ALJ's determination

-8-

that Rudd is best suited for work that is "not fast-paced or quota-based," but noted that the ALJ also found a different RFC was appropriate since Rudd had not received much mental-health treatment since the prior decision; was managing his symptoms with Cymbalta and Trazodone; and Dr. Wagner found that Rudd has a moderate limitation in dealing with work pressures.

As noted, upon a de novo review, the district court adopted the magistrate judge's findings and conclusions in toto, affirmed the final decision of the Commissioner, and dismissed Rudd's complaint.

Rudd appeals.

## II. Analysis

We review de novo the district court's legal conclusion that the ALJ's decision was supported by substantial evidence. *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 648 (6th Cir. 2011). "Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (initial quotation marks omitted).

### A. Res Judicata

First, Rudd contends that the ALJ erred in failing to apply the prior ALJ's RFC finding, as required by *Drummond v. Comm'r of Soc Sec.*, 126 F.3d 837 (6th Cir. 1997). In *Drummond*, this court held that "[a]bsent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ." *Drummond*, 126 F.3d at 842. The burden is on the Commissioner to prove changed circumstances. *Id.* at 843. *See* SSAR 98-4 (6), 63 Fed. Reg. 29771 (June 1, 1998) (acknowledging acquiescence with *Drummond*). In the prior decision, the ALJ found that Rudd had a RFC for a reduced range of sedentary work with some mental limitations, and

ultimately found Rudd was not disabled because he could perform other work that existed in significant numbers in the economy. The current ALJ found that Rudd's condition had changed.

Rudd's prior RFC was based on residuals from a motor-vehicle accident and right-knee surgery in 2005. In determining the initial RFC, the prior ALJ relied on a consultative- examination report from August 2005, which indicated that Rudd could not stand or lift objects over ten pounds because of his recent knee surgery, as well as a vocational expert's evaluation that Rudd was limited to a reduced range of sedentary or light work, which included limitations in walking and standing. The prior ALJ also relied on an October 2005 examination indicating that Rudd was doing fairly well.

Substantial evidence supports a finding that Rudd's condition improved since the prior 2007 decision. As the ALJ found, there is no evidence in the record that Rudd returned to his treating surgeon on follow-up or with any continuing ankle or knee complaints following the 2002 and 2005 surgeries. Rudd received treatment four times between November 2007 and July 2008 with Ward. As the ALJ noted, Rudd complained only of intermittent pain and his treatment was conservative. The ALJ also recognized that the x-rays taken during Rudd's treatment with Ward supported a finding that Rudd's orthopedic status had improved since the 2007 decision. The 2008 x-rays of Rudd's hands showed "no significant deformity," only "evidence of an old fracture, and only discrete arthritic changes." X-rays of Rudd's lumbar spine showed a "full range of motion," "good alignment, and position," no obvious fracture or defect, and no significant disc-space narrowing. Ward noted only once that Rudd's gait was "guarded," and Dr. Amble noted that Rudd could walk independently. This evidence is in direct contrast with the medical evidence before the prior ALJ, which showed that Rudd had standing and walking restrictions after his knee surgery.

In short, the record supports the ALJ's conclusion that Rudd's physical RFC improved since the 2007 decision because he received minimal and conservative treatment, his diagnostic tests were normal, and he had recovered from his injuries, including the July 2005 knee surgery. The prior ALJ found that Rudd's mental impairments precluded him from carrying out detailed instructions, making complex decisions, working with the general public, and performing fast-paced work. The prior ALJ also found that Rudd was limited to simple, repetitive, non-quota tasks. The prior ALJ based his decision on the neuropsychological evaluation by Mardis Dunham, Ph.D., which indicated that Rudd had deficits in concentration and psychomotor processing, and Rudd's early treatments at Four Rivers, which indicated that he had a GAF score of 55. However, since the 2007 decision, the record reflects that Rudd's mental status improved. The Four Rivers treatment notes state that Rudd's "overall mental status improved." The treatment notes also state that Rudd reported less depression and anxiety, had no depressive symptoms, and an improved GAF score of 60. Thus, substantial evidence supports the ALJ's finding that Rudd's mental condition had changed such that the prior mental RFC was not binding.

Rudd claims the ALJ failed to make "comparative point findings" between the prior findings and the current evidence. Assuming this argument is not waived, it fails. Neither *Drummond* nor SSAR 98-4(6) require the ALJ to make specific comparisons with the evidence supporting the prior final decision. SSAR 98-4(6) states that the proper inquiry is whether "new and additional evidence or changed circumstances provide a basis for a different finding of the claimant's residual functional capacity." Furthermore, in accordance with *Drummond* and SSAR 98-4(6), the ALJ considered new evidence and the prior ALJ's findings and found that the new evidence was material. That is, the ALJ reviewed the prior 2007 decision and the historical record, which included evidence from 1989,

1990, 2002, and 2005. The ALJ then evaluated the new evidence and explained how it established that Rudd's condition had improved because he recovered from his orthopedic injuries, had essentially normal x-rays of his hands and lumbar spine, had only intermittent pain, and demonstrated improved mental health. *See, e.g.*, *Perry ex rel. G.D. v. Comm'r of Soc. Sec.*, 501 F. App'x 425, 427 (6th Cir. 2012) (holding that ALJ properly considered new evidence of claimant's changed condition but found none of it material). Finally, to the extent that Rudd's suggestion that the ALJ needed to access the prior record in order to support her conclusion that his condition changed is also not waived, it is equally without merit. The proper focus is on the evidence since the prior ALJ's decision. *See Collier v. Comm'r of Soc. Sec.*, 108 F. App'x 358, 362-63 (6th Cir. 2004) (holding that new medical evidence supported the ALJ's finding of a higher RFC than a previous decision without comparison to evidence supporting prior decision).[3]

Next, Rudd asserts that his new mental evaluation established that he has greater mental impairment and limitations, and that substantial additional evidence established chronic physical impairments and limitations. However, as just discussed, substantial evidence supports the ALJ's conclusions that Rudd's orthopedic status and mental status improved.[4] The Commissioner's

---

[3]Rudd's citations to 42 U.S.C. § 423(f) and 20 C.F.R. §§ 404.1594 and 416.994 are inapplicable here because they apply to determining whether a claimant's prior entitlement to benefits ceased. Rudd never received benefits.

[4]Rudd claims that the ALJ's comment that Rudd's conditions were "essentially static" is inconsistent with a finding of improvement. However, context matters. Noting that Rudd had never been prescribed any narcotic medications and was currently taking over-the-counter pain relievers, and did not have a surgical condition, the ALJ stated that "[a]ll of his injuries are remote, well healed and essentially static." We read this to mean that Rudd's injuries were healed and not in a state of deterioration.

decision must be affirmed if substantial evidence supports it, even if substantial evidence would support an opposite conclusion. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012).

Rudd accuses the ALJ of improperly substituting her own medical judgment for that of medical experts, citing, *inter alia*, *Ross v. Gardner*, 365 F.2d 554, 558 (6th Cir. 1996) ("While the Secretary may have expertise in respect of some matters, we do not believe he supplants the medical expert.") and *Nguyen v. Charter*, 172 F.3d 31, 35 (1st Cir. 1999) ("As a lay person, . . . the ALJ was simply not qualified to interpret raw medical data in functional terms . . . ."). However, the record reflects that the ALJ actually requested the testimony of a medical expert, Dr. Wagner, to review the medical evidence pertaining to Rudd's mental status and limitations. The ALJ was not required to obtain a medical expert to interpret the medical evidence related to his physical impairments. In fact, the regulations require the ALJ to evaluate the medical evidence to determine whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1545(a)(3), 416.945.(a)(3); *Webb v.Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (stating that "the ALJ is charged with the responsibility of evaluating the medical evidence"); *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ  not a physician  ultimately determines a claimant's RFC. . . . An ALJ does not improperly assume the role of a medical expert by weighing the medical and non-medical evidence before rendering an RFC finding."). In other words, the ALJ was not required to obtain a medical expert to interpret the medical evidence related to Rudd's impairments.[5]

_____

[5]*Ross v. Gardner*, 365 F.2d 554 (6th Cir. 1966) is distinguishable. There, the hearing examiner relied on an extra-record medical text to evaluate the claimant's condition and to discount the medical opinion on record. *Ross*, 365 F.2d at 556-58 ("In disregarding the uncontradicted opinion evidence of the medical experts who had examined appellant, and in undertaking a scientific research of his own and deciding the case on what he thought this medical text meant, the Hearing Examiner set himself up as an interpreter of recondite medical knowledge and decided the case without regard to the evidence of the medical witnesses who had examined appellant."). Here, the

Furthermore, the ALJ did not interpret raw medical data beyond her ability. The x-rays of Rudd's hands and lumbar spine, which were the only raw medical data, had already been read and interpreted by a radiologist. The ALJ's conclusions regarding Rudd's lumbar spine and hands were consistent with the technician's interpretation of the x-rays. Thus, the ALJ properly evaluated the evidence of Rudd's physical condition without the assistance of a medical expert.

## B. RFC Finding

### 1. Physical RFC

Rudd asserts that there is no evidence to support the ALJ's finding that he has the physical RFC for the full range of light work. The ALJ found that Rudd could lift and carry up to twenty pounds occasionally, and ten pounds frequently, and that Rudd could sit, stand, and/or walk about six hours in an normal eight-hour workday with normal breaks every two hours. The ALJ's finding is supported by the evidence in the record that his treatment was minimal and conservative during the period at question; Rudd was treated with medication only, and more recently simply over-the-counter medication. His principal complaint of pain in his extremities was intermittent. As discussed above, x-rays of Rudd's lumbar spine and hands showed an absence of abnormalities. In addition, Dr. Amble noted that Rudd's gait and posture were independent, and Ward's treatment notes contained no indication that Rudd had difficulties standing or walking, noting only once that his gait was "guarded." In other words, Rudd's overall treatment history and the objective medical evidence support the ALJ's finding that Rudd could perform light work.

---

ALJ relied on the evidence from Rudd's treatment notes and diagnostic evidence.

Rudd claims that there is substantial evidence in the record to support the opposite conclusion. He cites the opinion or Dr. Irlandez, the non-examining state agency program physician, who opined that Rudd could only stand and/or walk for two hours in an eight-hour day. The ALJ expressly considered Dr. Irlandez's opinion, but found it not fully persuasive because it conflicted with the evidence that Rudd had not been prescribed an assistive device for walking, x-rays of his lumbar spine were normal, and his ankle and knee fractures had resolved. Thus, because the ALJ's opinion was supported by substantial evidence, it must be upheld, despite conflicting evidence. *See Ulman*, 693 F.3d at 714. *See also* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4). Furthermore, the ALJ was not bound by Dr. Irlandez's opinion, and she properly based her RFC determination on all the evidence of record. *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 404.1545(a)(3), 416.927(e)(2)(i), 416.945(a)(3).

Next, Rudd contends that the ALJ's RFC is not supported by substantial evidence because no physician opined that Rudd was able to perform the standing and walking requirements of light work. As we have mentioned, the ALJ is charged with the responsibility of determining the RFC based on her evaluation of the medical and non-medical evidence. As the Commissioner points out, the Commissioner has final responsibility for deciding an individual's RFC, SSR 96-5p, 1996 WL 374183 (July 2, 1996), and to require the ALJ to base her RFC finding on a physician's opinion, "would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." *Id.* This argument is rejected.

Rudd alleges that the ALJ failed to consider his upper-extremity problems. However, the record reflects that the ALJ specifically addressed the medical evidence relating to Rudd's upper extremities, including that he had sustained a nondisplaced fracture and crush injury to his left little finger in 1990, which did not prevent him from engaging in substantial gainful activity for years; and 2008 x-rays of Rudd's hands, which showed evidence of only an old fracture with no discrete arthritic changes. Based on this evidence, the ALJ found that while Rudd had a mild joint deformity affecting his small, left finger, it was not debilitating. Rudd's allegation is unfounded.

Rudd points out that the magistrate judge concluded that no evidence supported the ALJ's light-work RFC. The magistrate judge commented that "[i]n fact, no medical opinion in the administrative record supports a finding that the Plaintiff can engage in light work." The magistrate judge therefore faulted the ALJ for rejecting Dr. Irlandez's opinion that Rudd could stand and/or walk for two hours in an eight-hour workday, since there was no medical opinion to the contrary. However, as just discussed, the ALJ was not required to base her determination on a medical opinion, and substantial evidence, including objective medical evidence, supported her decision. This argument is without merit.

**2. Mental RFC**

Rudd further objects to the ALJ's mental RFC finding. Based on Dr. Wagner's testimony, the ALJ found that Rudd had slight limitations with simple instructions, making simple judgments for simple work-related decisions, and interacting with co-workers; moderate and mixed limitations with detailed instructions; and moderate limitations in interacting with the public and supervisors and responding appropriately to work pressures and changes. The following substantial evidence supports the ALJ's mental RFC finding: Rudd's treatment records from Four Rivers, which reported

moderate mental limitations with a final GAF score of 60; treatment records from Four Rivers showing that Rudd denied depressive feelings and presented appropriately; and the opinions of state agency physicians Dr. VanDivier, Ph.D., and Alex Guerrero, M.D., both of whom opined that Rudd could perform simple work, interact with supervisors and peers, and adapt to work changes based on their reviews of the mental-health evidence of record. Moreover, Dr. Wagner also reviewed all of the mental-health evidence prior to his testimony.

Rudd complains that the ALJ's reliance on Dr. Wagner was somehow improper because Dr. Wagner never examined Rudd. To the contrary, the ALJ's reliance on Dr. Wagner's testimony was consistent with the regulations and this circuit's precedent because he had reviewed all the medical evidence, and, as the ALJ found, his testimony was supported by that evidence. *See* 20 C.F.R. §§ 404.1527(c)(3), (4), 416.927(c)(3), (4). The ALJ was not precluded from relying on the opinion of a non-examining physician. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

Rudd argues that the ALJ should have included limitations on "fast paced" work or "quota work." However, they were part of the prior ALJ's mental RFC finding, and the ALJ found that Rudd's mental condition had changed since the previous finding.

In sum, we find that valid, substantial evidence supports the ALJ's mental-RFC finding, and Rudd's remaining allegations pertaining to his mental RFC do not warrant further discussion.

### 3. Function-by-Function Analysis

Rudd contends that the ALJ failed to perform a function-by-function assessment of his RFC, as required by 20 C.F.R. §§ 404.1545, 416.945, and explained in SSR 96-8p. SSR 96-8p explains that the ALJ should address a claimant's exertional and nonexertional capacities and also describe how the evidence supports her conclusions. SSR 96-8p, 1996 WL 374184 (July, 2, 1996). We find

that the ALJ's RFC assessment complied with SSR 96-8p. The ALJ fully specified Rudd's exertional and nonexertional abilities. This argument must be rejected. *See generally Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547-48 (6th Cir. 2002) (per curiam) (discussing SSR 96-8p).

### 4. Treating Physician

Rudd contends that the ALJ improperly ignored Dr. Butler's April 2009 opinion supporting Rudd's disability applications. We disagree. To begin with, as recognized by the ALJ, Dr. Butler was not a "treating physician." The regulations recognize that the nature and extent of a treating relationship is relevant to the weight given to physician's opinion. *See* 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i). A treating source is one who sees a claimant with a frequency consistent with accepted medical practice for the claimant's medical condition. 20 C.F.R. §§ 404.1502, 416.902. Rudd received treatment from Dr. Butler's office four times in 2007 and 2008. The last visit occurred in July 2008. As the ALJ noted, the treatment notes do not establish that Dr. Butler ever examined Rudd. Rudd's treatment was also sparse. The ALJ did not err in determining that Dr. Butler's opinion was not entitled to controlling weight.

Even if Dr. Butler was a treating physician, the ALJ did not err in failing to give his opinion controlling weight, since it was not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and was "inconsistent with the other substantial evidence." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 652 (6th Cir. 2006) (stating that "this court has consistently stated that the Secretary is not bound by the treating physician's opinions, and that such opinions receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence") (internal quotation marks and

alteration omitted). The ALJ correctly recognized that Dr. Butler's opinion that Rudd could not perform sedentary work conflicted with Rudd's sparse treatment, Rudd's x-rays, and use of over-the-counter medication. This argument is rejected.

### 5. Mental Opinions of Record

Rudd argues that the ALJ should have applied the factors found in SSR 96-2p and 20 C.F.R. §§ 404.1527 and 416.927 when weighing Dr. Amble's opinion, which opined that Rudd had marked to extreme work limitations. However, Dr. Amble was not a treating physician, so SSR 96-2p does not apply. *See Barker*, 40 F.3d at 794 (refusing to apply treating-physician rule to a psychologist who examined the claimant only once). Moreover, the ALJ expressly considered Dr. Amble's opinion and found that it was not consistent with the evidence as a whole. *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4). Dr. Wagner's testimony at the hearing supports the ALJ's conclusion.

> Contrary to his assertion, the ALJ also explicitly considered his history of a traumatic brain injury and Dr. Dunham's January 2007 neuropsychological evaluation from the prior ALJ's decision.

Rudd also argues the ALJ erred by not discussing the opinion of a registered nurse, Janet Orange, but her opinion was not on the record before th ALJ, and was first submitted to the Appeals Council. The ALJ, therefore, was not required to discuss it.

### C. VE Testimony

Rudd argues that the VE's testimony does not support the ALJ's decision because she did not include a limitation in her hypothetical question for "normal and meal breaks every two hours."

Notwithstanding, as the magistrate judge noted, breaks every two hours are normal and assumed in most jobs. *See* SSR 96-9p, 61 Fed. Reg. 34478 (July 12, 1996) (recognizing that an individual receives a morning break, a lunch period, and an afternoon break in approximately two hour intervals). Thus, any perceived omission is harmless. *See Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) (noting that this court reviews an administrative agency's failure to follow its own procedures for harmless error). Rudd faults the ALJ for failing to address most of the vocational testimony in this case, including neuropsychological and brain injury evidence from the prior decision. But the ALJ was not required to discuss all the evidence, as long as her factual findings as a whole show that she implicitly considered the record as a whole. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006). Nor was the ALJ required to rely on a VE's response based on limitations that she rejected. *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 247 (6th Cir. 1987). Although the VE testified that Rudd would not be able to perform any work if he were limited to the same RFC from the prior 2007 decision, the ALJ in this case found changed conditions. The ALJ was therefore not required to rely on this non-relevant portion of the VE's testimony. *See id.*

Rudd has waived any argument regarding the ALJ's finding as to his educational abilities. In any event, the ALJ asked the VE in the context of the alternative step-five finding whether Rudd could still perform the light and sedentary work identified by the VE even if Rudd were illiterate. The VE responded that Rudd could still perform the identified jobs. The claim is without merit in any event because substantial evidence supports the ALJ's finding that Rudd can perform his past relevant work.

Given this conclusion, we need not address Rudd's remaining arguments.

-20-

### III. Conclusion

Having carefully reviewed the record, the parties' numerous arguments, and the applicable legal principles, we hereby **AFFIRM** the judgment of the district court.