**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0888n.06

**No. 12-2249**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Oct 15, 2013
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| DENNIS JOHNSON, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellee. | ) | OPINION |

Before: DAUGHTREY, MOORE and STRANCH, Circuit Judges.

**JANE B. STRANCH**, Circuit Judge. Claimant Dennis Johnson applied for disability insurance benefits. After his application was denied by the state disability determination service, an administrative law judge (ALJ) determined that Johnson was not disabled. The appeals council denied Johnson's request for review. Johnson subsequently sought judicial review of the ALJ's decision in district court. The district court affirmed the denial of benefits, and Johnson now appeals. For the following reasons, we **AFFIRM**.

## I. Background[1]

Beginning in the late 1980s, claimant Dennis Johnson sought treatment at the Department of Veterans Affairs (VA) for low back pain and right leg radiculopathy. In January 2002, Johnson injured his back while working as a baggage handler and has not worked since his injury.[2] A few days after his accident, Johnson saw Dr. David Pommerening. His patient statement indicated that he hurt his leg while carrying luggage, but Dr. Pommerening noted that the pain was located in the right sacral region. Johnson had numbness in several of his right toes, and the pain radiated down his right leg. He also had a positive straight-leg raise on the right side. Johnson exhibited tenderness at the right sacrum and decreased range of motion and an X-ray showed narrowing of the L4-L5 and L5-S1 disc space. Dr. Pommerening recommended physical therapy and medication.

On January 11, 2002, Johnson saw Dr. Pommerening again, and reported that while medications improved his pain, his one session of physical therapy did not make him feel better. At that time, Johnson's straight-leg raises were negative. He was instructed to avoid excessive bending, squatting, kneeling, standing, or walking; and to avoid lifting over 10 pounds. He was also prescribed pain medication. On January 16, Johnson reported improvement, and his restrictions were changed somewhat. Johnson appears to have engaged in physical therapy on January 15 and 16.

---

[1]The history discussed occurred between January 3, 2002 and the last date insured, March 31, 2007. And while there is a substantial amount of medical evidence concerning Johnson's mental impairments—posttraumatic stress disorder and depression—the main focus of his appeal is on his physical condition. Accordingly, the recitation of facts focuses primarily on physical findings.

[2]During the relevant time period discussed below, Johnson was seen regularly by his primary care physician, Dr. Rodney Poling.

On January 21, Johnson saw Dr. Pommerening and reported that his symptoms had worsened. Johnson again had a positive leg raise on the right, tenderness on the lower spine, and decreased range of motion. Dr. Pommerening prescribed additional medication and referred Johnson to a physiatrist. Johnson went to Dr. Aaron Sable, who found no radiculopathy but noted discomfort and reduced range of motion. Johnson experienced slight discomfort in the straight-leg raise to the right. Dr. Sable recommended physical therapy, prescribed several medications, and suggested an MRI. He also recommended restrictions on certain physical movements—such as sitting, standing, and walking—and that Johnson avoid lifting over 10 pounds. An MRI revealed a disc herniation at L5-S1 and a mild disc displacement at L4-L5 with "mild leftward proximal L5 root sleeve effacement."

On April 20, 2002, Johnson was examined by Dr. Phillip F. Krogol, a neurosurgeon who found Johnson was experiencing "moderate discomfort" and his gait was affected on the right side. He also noted limits in Johnson's range of motion, tenderness, and pain with straight-leg raises on the right and diagnosed "[l]umbar myofascitis with radiculitis secondary to herniated disc L5-S1 on the right." Dr. Krogol recommended that Johnson continue physical therapy as directed by his treating physician, Dr. Poling, but noted that surgery would be an option if he did not improve.

Nerve conduction tests performed in May 2002 were within normal limits. A second MRI taken in October 2002 revealed a "narrowing and desiccation of L4-5 and L5-S1 discs" and a "[c]entral disc herniation at L4-5 . . . extend[ing] slightly more prominently to the right of midline [that] does encroach upon the proximal portion of the right neural foramen at this level." A third MRI from February 2004 showed mild disc space narrowing, mild circumferential disc bulging at

L4-L5, as well as mild disc space narrowing and "a large central right paracentral" herniation with "mild S1 nerve root edema."

In May 2004, Johnson was examined by Dr. Norman J. Rotter, a neurologist. Johnson's gait was normal, he had minimal low back tenderness, his range of motion was mildly limited, and his strength and coordination were good. Straight-leg raises on the right produced "radicular type findings," and Dr. Rotter discussed the option of surgery. Dr. Fred Junn, another neurologist, also consulted on this referral. He was uncertain that surgery was the best option, but noted that it might be in order should Johnson's condition progress. Rather than undergo surgery, Johnson decided to consider his options further.

In April 2006, a new MRI of Johnson's spine was compared with an older one. The findings appeared relatively similar. Dr. Poling referred Johnson to pain management that month. At that time, he did not use an assistive device for ambulation and reported taking narcotic pain relievers and medication for panic disorders and depression. Johnson's straight-leg raise on the right was "mildly positive" and his muscle strength was 5/5. His range of motion in the lumbar spine was slightly diminished, but there was no tenderness. Based on Johnson's symptoms, the recommended treatment plan was a series of three epidural steroid injections. Although the first two provided some relief, Johnson decided to wait on the third because he had recently had a reaction to a drug he was taking for depression.

In October 2006, Dr. Poling referred Johnson to Dr. Teck Mun Soo, a neurological surgeon. At that time, Johnson rated his pain as an 8/10 for his back and a 7/10 for his leg and reported taking narcotic medication for pain and anxiety medication. Johnson's lumbar spine was not tender; there

was a normal range of motion; and his straight-leg raises were negative on both sides. Dr. Soo recommended an L4-S1 lumbar fusion that Johnson wanted to think about. On March 29, 2007, Dr. Poling examined Johnson and identified a decreased range of motion. He provided an April 5 letter stating the following work restrictions: (1) no lifting over 10 pounds; (2) no excessive standing, sitting, or bending; and (3) Johnson should be allowed to lie down as needed to relieve pain.

On September 4, 2007, Johnson was evaluated by Dr. Rojas, an internist, for the Michigan Disability Determination for Social Security Administration. Johnson reported that he had been using a cane for around eighteen months. Dr. Rojas noted Johnson's mobility was slightly impaired and that his lumbar area was moderately tender and diagnosed chronic low back pain due to degenerative disc disease and a herniated disc at L5-S1 with radiculopathy on the right side. Johnson was also evaluated by a psychiatrist, Dr. Ibrahim Youssef, on that same day. Dr. Youssef diagnosed Johnson as suffering from PTSD, depression, and assessed a Global Assessment of Functioning (GAF) of 45 to 50. He evaluated Johnson's prognosis as "[g]uarded due to the chronicity" of his condition.

## II. Administrative Proceedings

In May 2007, Johnson filed an application for disability insurance benefits and in a June 2007 disability report, noted his use of pain and sleep medication. He stated that he used a cane, could not be on his feet for more than 30 minutes, and could walk one block before he needed to stop and rest. Johnson prepared his son's meals, but did not prepare his own. He reported doing dusting and light cleaning, but had to take frequent breaks. He also went grocery shopping once a

week and was able to pay bills. Although Johnson did not spend time with others, he attended PTSD group therapy once a week.

Johnson's wife, Lorie Johnson, also filled out a third-party function report. She stated that Johnson cooked dinner when he was able and could sometimes help with errands, but that he did no housework or yard work. She claimed that Johnson took his mother to the mall occasionally. Mrs. Johnson listed her husband's interests as watching television, watching his son's sports competitions, and walking to a yard sale if he was able. He also paid the bills. Mrs. Johnson observed that Johnson spent some time with others. She estimated that he could walk about a mile, although he would be in pain for the remainder of the day. She agreed that Johnson had a cane, but was unsure whether a doctor prescribed it.

In November 2008, Dr. Poling filled out a residual functional capacity (RFC) questionnaire. He estimated that Johnson could walk less than one city block without rest or experiencing severe pain; sit and stand for 30 minutes, but not more than one hour; and sit and stand/walk less than two hours during an eight-hour work day. Dr. Poling also opined that Johnson would require a job that permitted shifting positions at will from sitting, standing or walking and allowed unscheduled breaks. He also noted that Johnson would need a cane for standing/walking; could occasionally lift less than 10 pounds; could rarely lift 10 pounds; and should never lift 20 lbs.

At a hearing before the ALJ in December 2008, Johnson testified that his previous work experience included driving 10 hours a day as a hotel shuttle driver from March 1993 until the date of his back injury. He also delivered pizza for a time. Johnson claimed that he could not return to such work because of the pain in his lower back. As to daily activities, he testified that he took his

son to the bus in the morning and picked him up in the afternoon. He stated that he prepared meals about once a day and went to the grocery store about once a week, but that he did not perform any household chores. While at the grocery store, he utilized an electric wheelchair. He stated that he visited with people, or they visited him, about three times a week and claimed that he did not pay bills.

Johnson stated that, on average, his pain was "moderate to severe" and was continuous. He stated that he regularly used a cane and that he spent at least seven hours a day on the floor. Johnson claimed that he could stand for 15 to 20 minutes and could sit for 20 to 25. He stated that he could potentially walk two blocks. He had not been to the emergency room or the hospital in the past 12 months.

A vocational expert (VE) also appeared at the hearing. The ALJ posed a number of hypotheticals to the VE. The first involved the type of work available to an individual with a light RFC and Johnson's history who could lift, push, or pull 20 pounds occasionally and 10 frequently; walk and stand frequently; and sit, stoop, or bend occasionally. Although such a person could not return to Johnson's previous work, the VE opined that there were 8,000 light, unskilled housekeeping positions; 40,500 light, unskilled cashier positions; and 2,150 light, unskilled parking lot attendant positions.

For the second hypothetical, the ALJ asked the VE to assume that the person was "non-exertional," and unlimited in attention, concentration, understanding, and memory; had "intact and unlimited" vision, hearing, reach, and fine manipulative abilities; a slight limitation in gross manipulative ability with the right dominant features; was slightly limited in routine tasks; had no

environmental restrictions; would have unlimited contact with the public and needed occasional supervision; and who suffered from slight to moderate pain. The VE hypothesized that this would result in a 10 percent erosion of the available jobs.

The VE was then asked to assume that this same person had slight limitations in attention, concentration, understanding, and memory; and was moderately limited in gross manipulative ability "with the right dominant feature." He opined that there would be a 90 percent reduction in the housekeeping and cashier positions, as well as an 80 percent reduction in the parking lot attendant positions. Assuming that the person's pain level was "moderate to severe, but remain[ed] only slightly limited in the ability to do SRT [simple routine tasks]," the VE stated that there would be a 95 percent reduction in the housekeeping and cashier positions and an 85 percent reduction in the parking lot attendant positions. Assuming that the person was "moderately limited in the ability to do SRT," the VE stated that there was a 100 percent reduction.

For the third hypothetical, the VE was asked to assume that a person with Johnson's history had a sedentary RFC, and that he could lift, push, pull 10 pounds occasionally and five frequently; that he could walk, stand, stoop, bend occasionally; and sit frequently. The VE stated that there were 2,500 sedentary, unskilled order clerk positions; 1,500 sedentary, unskilled grinding machine operator positions; and 2,000 sedentary, unskilled ticket counter jobs available.

For the fourth hypothetical, the VE was asked to assume the following non-exertionals: no limitation in attention, concentration, understanding, and memory; intact vision, hearing, reach, and fine manipulative abilities; slight limitation in gross manipulative ability with the right dominant feature; slight limitation in ability to do routine tasks; no environmental restrictions; unlimited

contact with the public; occasional supervision; and slight to moderate pain. The VE concluded that this would result in a 20 percent reduction in the available jobs. Adding a slight limitation in attention, concentration, understanding, and memory; and moderate limitations in gross manipulative ability with the right dominant feature, the VE found a 100 percent reduction.

Johnson's counsel asked what effect the use of a cane would have on the light work positions, and the VE opined that it would eliminate housekeeping positions; cashier positions would be reduced by 80 percent; and the parking lot attendant positions would be reduced by 95 percent. Johnson's counsel questioned the VE about the source of his information; he responded that it came from the Dictionary of Occupational Titles and the Occupational Employment Quarterly of Statistics.

The ALJ determined that Johnson had not engaged in substantial gainful activity during the relevant time period and that he suffered from the following severe impairments: degenerative changes of the lumbosacral spine; a history of fracture of the right arm; "prolonged and chronic" posttraumatic stress disorder; depression; and cannabis dependence. Because the ALJ concluded that the impairments did not meet or equal one of the relevant listings, he analyzed Johnson's residual functional capacity (RFC). The ALJ determined that Johnson had the RFC to lift and carry 20 pounds occasionally and 10 pounds frequently; that he could stand and/or walk frequently; that he could occasionally sit, stoop, and bend; that he had no limitations in fine manipulation, but moderate limitations in gross manipulation with his right dominant upper extremity; that he had slight limitations in attention, concentration, understanding, and memory; that he had slight

limitations in his ability to perform simple routine tasks; that he required only occasional supervision; and that he had slight to moderate pain.

Although finding that Johnson's medically determinable impairment "could have been reasonably expected" to produce his subjective complaints, the ALJ concluded that Johnson's statements were not entirely credible. Specifically, the ALJ noted that Johnson claimed that his inability to work stemmed from his physical problems, but in September 2007, he told a consultative psychiatrist that he could not work due to anger and inability to trust people. And although the ALJ observed that various tests revealed disc herniation and dessication; possible nerve root involvement; and radiculopathy, he found the clinical evidence to be "less impressive," noting that Johnson had generally exhibited normal gait and muscle function. Rather than crediting the RFC submitted by Dr. Poling, the ALJ attributed significant weight to the report of Dr. Soo, a specialist, who noted negative straight-leg raises and found Johnson's range of motion, strength, and sensation to be normal. The ALJ found the fact that Johnson exhibited spinal problems prior to the January 2002 incident to speak to his credibility because he claimed that a traumatic injury occurred on this date, but, in reality, he had a preexisting condition. The ALJ likewise concluded that Johnson's treatment history was inconsistent with significant impairment; although he was offered surgery, he declined to have it; and after two successful steroid injections, he failed to obtain a third.

The ALJ pointed out that in June 2007 (shortly after the last date insured), Johnson described greater functioning than he did at the hearing and attended group therapy despite claiming that he wanted to avoid everyone but his wife and son. The ALJ also noted that he had been inconsistent in reporting to various physicians the medications he was taking and noted that he at times took

medication while using marijuana, against the instructions of his doctors. Although Mrs. Johnson's description of her husband's daily activities was generally the same as his, it described greater functioning at various points.

The ALJ noted that Johnson's inconsistencies regarding cane usage were "troubling," and that Dr. Soo's clinical findings did not suggest that he needed one. And although Johnson expressed distress at a nurse's questioning him about whether he wanted to get well or was "only in it for the money," the ALJ found "this consistent with his refusal of a third injection and failure to pursue recommended surgery." The ALJ also observed that Johnson had not sought hospital treatment or visited the emergency room in the past 12 months.

Turning to the medical opinions, the ALJ determined that Dr. Poling's notes from March and April 2007 merely recorded Johnson's subjective complaints, and that the clinical findings recorded by Dr. Soo did not support the given restrictions. The ALJ also declined to accept Dr. Poling's assessment on Johnson's RFC because it reflected his condition in November 2008 and conflicted with Dr. Soo's report, which he deemed more relevant. The ALJ ultimately concluded that Johnson was not disabled because jobs existed in significant numbers in the national economy that he could perform.

The Appeals Council denied Johnson's request for review. In doing so, it considered both the allegations of error and the additional evidence submitted by Johnson.[3] Johnson then filed suit

---

[3]This information included medical records demonstrating that Johnson had back surgery on January 8, 2010; records showing reinstatement of his workers' compensation benefits in September 2010; and a medical marijuana card issued on July 7, 2010.

in federal court seeking judicial review of the decision.[4]  The Commissioner's motion for summary judgment was granted after the district court concluded that substantial evidence supported the ALJ's decision.

Johnson appeals, alleging that:  (1) proper deference was not given to Dr. Poling's opinion; (2) the ALJ did not consider the record as a whole in making his credibility determination; (3) the ALJ failed to assess the impact of his "severe" impairments on his ability to engage in basic work activities and do a "function by function" analysis; and (4) his case should be remanded pursuant to sentence six of 42 U.S.C. § 405(g) to consider evidence submitted after the ALJ's decision.

### III.  DISCUSSION

**A.  Standard of Review**

This court reviews district court decisions in social security cases de novo.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  However, that review "is limited to determining whether the Commissioner's decision 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Id.* (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)).  This standard requires us to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal quotation marks omitted).  When the Commissioner's decision is supported by substantial evidence, we defer to it, even if "substantial evidence in the record . . .

---

[4]The parties consented to having a magistrate judge resolve the matter.

would have supported an opposite conclusion." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (quoting *Longworth v. Comm'r of Soc. Sec. Admin.*, 402 F.3d 591, 595 (6th Cir. 2005)) (internal quotation marks omitted).

**B. Treating physician's opinion**

Johnson argues that proper deference was not given to the opinion of his treating physician, Dr. Poling, regarding the severity of his impairments. Under the pertinent regulations, more weight is generally given to the opinion of a treating physician. *See* 20 C.F.R. § 404.1527(c)(2). As long as the treating physician's opinion regarding the nature and severity of the claimant's impairment "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," it will be given controlling weight. *Id.* If the ALJ chooses not to give the treating physician's opinion controlling weight, he or she must determine what weight to give it by looking at various factors, including the length of the treatment relationship and the frequency of examination; the nature and extent of the treatment relationship; the supportability of the opinion; its consistency with the record as a whole; the specialization of the physician or doctor rendering the opinion; and other factors that support or contradict the opinion. *Id.* § 404.1527(c)(2)–(6).

However, "a treating physician's opinion is only entitled to such . . . deference when it is a *medical opinion*." *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 492-93 (6th Cir. 2010). If the treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors—"his decision need only 'explain the consideration given to the treating source's

opinion.'" *Id.* at 493 (quoting Soc. Sec. Rul. 96-5p, 61 Fed. Reg. 34474). The opinion, however, "is not entitled to any particular weight." *Id.* In essence, the ALJ afforded no weight to Dr. Poling's opinions from March and April 2007 and November 2008. He concluded that Dr. Soo's opinion was more probative because (a) Dr. Soo was a specialist and (b) Dr. Poling's assessment of Johnson's impairment was inconsistent with Dr. Soo's objective findings. The ALJ also observed that two of Dr. Poling's opinions were rendered after the last date insured, whereas Dr. Soo's was rendered before that date.

As did the district court, we find the ALJ's decision supported by substantial evidence. Johnson appears to rely largely on Dr. Poling's November 2008 RFC questionnaire on this point. The regulations, however, do not require that such an opinion be given any special significance. *See* 20 C.F.R. § 404.1527(d)(3). Moreover, the ALJ explained that the questionnaire—created well after the date last insured—likely described a deterioration in Johnson's condition, rather than Johnson's condition during the time period in question. In contrast, Dr. Soo's evaluation contained clinical findings indicating that Johnson's performance on certain tests was within the normal range. And although Johnson had an extensive history with Dr. Poling, his treatment consisted mainly of prescribing Johnson medication and referring him to specialists. Dr. Soo specifically examined Johnson in order to evaluate his back condition and was an expert in this area. We find the ALJ's explanations as to why he placed greater weight on Johnson's non-treating physician to be adequate and supported by the record as a whole.

## C. Credibility determination

-14-

The ALJ determined that Johnson's complaints of pain were not entirely credible because they did not align with the clinical findings and medical evidence. Johnson argues that the ALJ erroneously considered only select portions of the record.

Credibility determinations regarding the applicant's subjective complaints of pain rest with the ALJ and are afforded great weight and deference as long as they are supported by substantial evidence. *See Torres v. Comm'r of Soc. Sec.*, 490 F. App'x 748, 755 (6th Cir. 2012). In assessing an individual's credibility, "the ALJ must [first] determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged." *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370, 371 (6th Cir. 2011). The ALJ made this finding here. Next, the ALJ must evaluate the intensity, persistence, and functional limitations of the symptoms by considering objective medical evidence, as well as: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions. 20 C.F.R. § 404.1529(c)(1)–(3).

We conclude that the ALJ's credibility determination was supported by substantial evidence. The ALJ observed that Johnson's answers to his disability questionnaire in June 2007 "described greater functioning" than did his hearing testimony because he stated that he did some housework; could pay bills and manage bank accounts; and attended group therapy for PTSD, despite claiming that he avoided everyone except his wife and son. The ALJ also determined that Johnson's wife's

comments did not demonstrate disability because she described slightly greater functioning than did Johnson's testimony.

The ALJ also appropriately based its credibility determination on the clinical findings, which were inconsistent with total disability and indicated that Johnson's condition during the relevant time period was not rapidly deteriorating. It was also appropriate for the ALJ to rely on the limitations reported to the agency in June 2007 over the limitations Johnson reported at the hearing, as the ALJ explained that the former were closer to the last date insured. And overall, Johnson's treatment was modest, which, as the district court pointed out, we have generally found to be "inconsistent with a finding of total disability." *Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 (6th Cir. 2011).

We defer to the ALJ's properly supported credibility determination but pause to address certain arguments of ALJ error with which we agree. That Johnson chose to attend group therapy for PTSD should not have diminished his credibility regarding his claim that he avoided everyone except his wife and son. A claimant should not be penalized for following through with treatment related to a claimed disability. The ALJ also viewed Johnson's statement to Dr. Youssef—that he could not work due to anger and inability to trust people—to indicate that Johnson's physical complaints were only secondary. Although Dr. Youssef listed the mental problems first, he was evaluating Johnson for psychiatric purposes; Johnson never specifically claimed that his physical problems were "secondary." In this context, the statement does not discredit Johnson.

The ALJ's consideration of Johnson's failure to proceed with surgery and his limited engagement in physical therapy is a bit more concerning. In general, it is appropriate for the ALJ

to consider a claimant's treatment (other than medication) in evaluating his or her symptoms and pain, *see* 20 C.F.R. § 404.1529(c)(3)(v), and a claimant must follow *prescribed* treatment in order to obtain benefits absent good reason. *See* 20 C.F.R. § 404.1530. The record, however, indicates that these were only recommended treatment options. Neurosurgeon Dr. Fred Junn opined that Johnson's surgical outcome "would be suboptimal" and that surgical intervention might not be the best choice. Moreover, Social Security Ruling 96-7p strongly suggests that a claimant should be allowed to explain his or her reasons for not pursuing certain treatment options. *See Carmickle v. Comm'r*, 533 F.3d 1155, 1162 (9th Cir. 2008) ("[A]lthough a conservative course of treatment can undermine allegations of debilitating pain, such fact is not a proper basis for rejecting the claimant's credibility where the claimant has a good reason for not seeking more aggressive treatment.") The better course here would have been to allow Johnson the opportunity to explain his choices.

The presence of these errors, however, does not warrant reversal. We recently held that even if an ALJ's adverse credibility determination is based partially on invalid reasons, harmless error analysis applies to the determination, and the ALJ's decision will be upheld as long as substantial evidence remains to support it. *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). We find the ALJ's errors in this case to be harmless and conclude that substantial evidence supports the adverse credibility determination regarding Johnson's complaints of pain.

**D. Failure to properly evaluate severity of Johnson's impairments**

Johnson argues that the ALJ did not properly evaluate his severe impairments by assessing their impact on basic work activities and doing a "function by function" analysis. More specifically, he contends that the ALJ: (1) failed to consider his obesity in combination with his back condition

in determining his ability to walk and stand; (2) failed to assess the restrictions caused by his post-traumatic stress disorder and depression; (3) failed to assess his need for a cane; and (4) failed to rely on Dr. Youssef's report, which demonstrated more limited functioning.

We agree with the district court's conclusion that the ALJ properly considered Johnson's impairments and, contrary to his arguments, considered all of them, whether severe or not, in combination with one another. First, the ALJ did consider Johnson's obesity, but observed that there is scant mention in the medical records of Johnson's weight. There is certainly nothing to indicate that any doctor who saw him was concerned that his weight was affecting his mobility. The ALJ did not err on this point. Second, Johnson simply disagrees with the extent to which the ALJ concluded his mental impairments limited his ability to work. The conclusion that Johnson's PTSD and depression did not render him disabled was supported by substantial evidence. Third, the ALJ did consider whether Johnson required the use of a cane, but found inconsistencies in Johnson's own testimony that one was prescribed and found a lack of evidence in the medical record demonstrating a need. Because the ALJ found that the evidence did not suggest that Johnson needed a cane, it was not erroneous for the ALJ to exclude this factor in determining Johnson's RFC.

Last, as to the argument that Dr. Youssef's report—which diagnosed Johnson with PTSD and depression and assigned him a GAF of 45 to 50—demonstrates that his functioning was more limited, no particular amount of weight is required to be placed on a GAF score. *See, e.g.*, *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) (noting that a GAF "is not essential to the RFC's accuracy"). The ALJ explained that it was relying on Johnson's medical records and non-medical opinions in assessing the extent of Johnson's mental impairments. The ALJ considered the

fact that Johnson suffered from PTSD and depression and we find that the ALJ's assessment of the severity of Johnson's impairments was supported by substantial evidence.

## E.  Conflicts between VE's testimony and Dictionary of Occupational Titles (DOT)

Social Security Ruling 00-4P instructs an ALJ to "identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs or VSs and information in the . . . [DOT] . . . ."  SSR 00-4P, 2000 WL 1898704, at *1 (Dec. 4, 2000).  In the Sixth Circuit, the ALJ's duty is satisfied if he or she asks the VE whether his or her testimony is consistent with the DOT.  *See Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 374 (6th Cir. 2006).  Although the ALJ himself did not inquire as to whether there were conflicts between the vocational expert's testimony and the DOT, Johnson's counsel asked the VE about his source, which he stated was the DOT.  At that point, Johnson did not allege that any conflicts existed.  The ALJ is not required to affirmatively "conduct an independent investigation into the testimony of witnesses to determine if they are correct."  *Martin*, 170 F. App'x at 374.  Although Johnson attempts to identify conflicts at this juncture, we agree with the Commissioner that they are irrelevant.  Accordingly, any error is harmless.  *Cf. Poppa v. Astrue*, 569 F.3d 1167, 1174 (10th Cir. 2009) (finding "the ALJ's error in not inquiring about potential conflicts [to be] harmless" where no conflicts existed between the VE's testimony and the DOT's job descriptions).

## F.  Motion for remand

Johnson contends that the district court erred by not remanding his case to the ALJ for consideration of documents demonstrating that he underwent back surgery in January 2010; obtained a medical marijuana prescription in July 2010; and that his workers' compensation benefits for his

back injury were reinstated in September 2010. A remand pursuant to sentence six of 42 U.S.C. § 405(g) is appropriate "only if the evidence is 'new' and 'material' and 'good cause' is shown for the failure to present the evidence to the ALJ." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010). Evidence is "new" if it did not exist at the time of the administrative proceeding and "material" if there is a reasonable probability that a different result would have been reached if introduced during the original proceeding. *Id.* "Good cause" is demonstrated by "a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).

The district court concluded that the evidence, although new, is not material because it does not relate to Johnson's condition on the last date insured. While evidence of subsequent surgery and reinstatement of workers' compensation benefits could be material in some situations, here the events of 2010 are not adequately related to the analysis of Johnson's condition as of March 2007 to qualify for remand. Johnson has not demonstrated a reasonable probability that the new evidence would have caused the ALJ to reach a different result. Remand under sentence six is therefore not warranted in this case.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court upholding the Commissioner's decision.