**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 14a0245n.06

Case No. 13-1721

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Apr 01, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| SHERI CURLER, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| COMMISSIONER OF SOCIAL SECURITY, | ) | MICHIGAN |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | |

Before: KEITH, SILER, and ROGERS, Circuit Judges.

**SILER**, Circuit Judge. Sheri Curler appeals the district court's judgment affirming the Commissioner's denial of supplemental security income ("SSI"). For the following reasons, we **AFFIRM**.

## I. FACTS

Curler was born in 1968, has a high school equivalent education, and her employment history includes work as a cashier, a day care worker, and a teacher's assistant. At the time of the most recent administrative hearing, she lived with her then ten-year-old son. Curler's September 2007 application for SSI benefits alleged that limitations related to back problems, depression, anxiety, and bipolar disorder prevented her from working as of November 1, 2006.

**Medical Evidence of Mental Functioning**

In March 2006, Curler was assessed at List Psychological Services ("List") as having a Global Assessment of Functioning ("GAF") score of 58.[1] She was discharged from List in June 2007; the discharge summary signed by both Curler's therapist and treating psychiatrist indicates a diagnosis of bipolar disorder and anxiety. Her prognosis was deemed "fair" and she was assigned a GAF score of 55. Her treating psychiatrist assessed only mild or moderate limitations—rather than marked or extreme impairments—in various areas of functioning. It was also noted that Curler was largely noncompliant with attending therapy sessions, the last of which took place in December 2006.

At Curler's first visit with psychiatrist Michael Ingram, M.D., in September 2007, he performed a Comprehensive Psychiatric Assessment. Dr. Ingram observed that she was "alert and oriented," that her immediate, short-term and long-term memory was "intact," that her concentration was normal, and that she had a general fund of knowledge. Dr. Ingram diagnosed major depression (recurrent) and unspecified anxiety disorder, assessed a GAF score of 41-50,[2] and a fair prognosis. The next month, Curler told Dr. Ingram that her depression was at a severity level of five on a ten-point scale. Dr. Ingram noted Curler's mood was somewhat anxious, but her thoughts were clear and organized, and her affect was appropriate.

---

[1]GAF is a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 n.7 (6th Cir. 2006). A GAF of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* at 503 (citation and alterations omitted).
[2]A GAF of 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Kornecky*, 167 F. App'x at 503 (citation omitted).

On January 15, 2008, psychologists Sally Glowicki and Ann Date performed a consultative examination of Curler at the request of Michigan's Disability Determination Service. At that time, it was noted that Curler was "able to drive, manage money, do laundry, cook, and clean . . . [but that] grocery shopping [was] difficult[] at times due to her back and she ignores cleaning the house due to depression." Her "carriage, station and gait appeared unremarkable" and "[n]o overt pain behaviors were observed." Her speech was noted as "logical, organized and relevant." She was oriented as to person, place, and time, her memory was good, and information was appropriately provided. Glowicki and Date diagnosed Curler with an unspecified mood disorder, assigned a GAF score of 52, and assessed her prognosis as fair.

On January 23, 2008, Curler was again seen by Dr. Ingram, who diagnosed recurrent mild major depressive disorder. Dr. Ingram also noted that her speech was normal, affect was appropriate, thought content was normal, thought process was coherent, attention was normal, perception was normal, intellect was average, insight was good, and judgment was appropriate. Dr. Ingram discontinued Curler's prescription medication and referred her to therapy, noting that therapy does "require regular attendance" and there "have been some concerns with the attendance in the past," but he was willing to "give the patient the benefit of the doubt."

Shortly thereafter, on January 25, 2008, psychologist Joe DeLoach reviewed Curler's records for the state agency, completed a mental residual functional capacity ("RFC") assessment, and concluded that she "retains the capacity to perform simple tasks on a sustained basis." For example, Curler was not significantly limited in her ability to understand, remember, and carry out very short and simple instructions; the ability to carry out detailed instructions; and the ability to make simple work-related decisions. Importantly, she was not considered

"markedly limited" in any of the twenty mental activities that were rated. Dr. DeLoach determined that Curler was "capable of simple one and two step tasks" and that her "psychological limitations do not appear to interfere with the potential for work activities that are simple in nature." Separately, Dr. DeLoach reviewed a number of factors that would correspond to various affective disorders and found Curler not to be afflicted with depressive syndrome, manic syndrome, or bipolar syndrome; instead, he documented that she had an unspecified mood disorder. In rating Curler's functional limitations with respect to her mood disorder, Dr. DeLoach indicated she had no episodes of decompensation of extended duration.

In February 2008, Curler saw therapist Lisa Schwab on a referral from Dr. Ingram in connection with her plan to have bariatric surgery. After an initial evaluation, Schwab diagnosed Curler with depression and assigned a GAF score of 55.

In May 2008, Dr. Ingram noted in his records that Curler was off anti-depressant medication and denied feeling depressed or fatigued. However, during her visit, Curler also told Dr. Ingram that she wanted to be treated with anti-depressants, felt tired, and had anxiety symptoms. Dr. Ingram diagnosed Curler with depression and prescribed a low dose of Effexor. In his records from the date of Curler's visit, Dr. Ingram wrote that Curler requested a note verifying that she was participating in mental health therapy because it was required by the bariatric surgery center; he indicated in Curler's file his concern that most of her motivations for attending therapy appeared to be related to obtaining approval for bariatric surgery.

In August 2008, Dr. Ingram expressed reluctance at excusing Curler from Work First classes—a welfare-to-work program—because Curler had failed to take medication as prescribed, failed to work with her therapist, and missed appointments with Dr. Ingram himself. Nevertheless, the following month, Dr. Ingram completed a form for the Michigan Department

of Human Services stating that Curler could not attend Work First classes for 12 months due to depression.

In January 2009, Dr. Ingram signed a report from therapist Carol Robinson that attributed to Curler a GAF score of 45. The reason cited by the therapist for Curler's discharge was "Non-compliant/No contact." Curler described her mood to Dr. Ingram as "okay" in March 2009, "a little bit" anxious in May 2009, "okay" and "a little bit on the low side" in August 2009, and in December 2009 she told him her mood was "fair" after her August 2009 bariatric lap band surgery. Dr. Ingram repeatedly noted Curler's denial of psychosis or hallucinations and her ordered speech and thought.

In March 2010, Dr. Ingram received a form from the Michigan Department of Human Services requesting that he assess Curler's ability to perform mental work-related activities. Despite being provided space for comments, and the instruction that supportive medical findings or clinical notes be attached, Dr. Ingram only checked boxes on the form. He indicated that Curler had no limitations in her ability to follow work rules, interact with supervisors, use judgment, or function independently. However, he attributed to Curler marked-to-extreme limitations in a variety of areas of mental functioning and "four or more" episodes of decompensation of extended duration.

**Medical Evidence of Physical Functioning**

In February 2007, Curler complained that she had strained the lumbar portion of her back while lifting children. In May 2007, she complained of constant, sharp lumbar pain on the left side and dull stiffness from her neck to her shoulders after her car was rear-ended. An MRI of the lumbar spine taken that month was "negative"; the radiologist commented that "[n]o compression deformity can be identified" and the "disc spaces appear fairly well maintained." In

August 2007, Curler complained of severe lower back pain that occasionally radiated to her leg. She was prescribed hydrocodone and tramadol.

Curler had submitted no further evidence of physical limitations when Larry Thompson, M.D., reviewed the records for the state agency in January 2008 in order to complete a physical RFC assessment. Dr. Thompson concluded that Curler could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for at least 2 hours per workday, sit for about 6 hours per workday, and occasionally climb stairs or ramps, balance, stoop, kneel, crouch, and crawl. There were no manipulative, visual, communicative or environmental limitations established.

In March 2008, Curler saw neurologist Steven Beall, M.D., to address daily headaches, which were 1 out of 10 in severity, and some tingling in the left fingertips. Based on a neurological examination, Dr. Beall found that Curler was oriented as to person, place and time, and that "[a]ttention span, concentration, registration, recent and remote memory, language and fund of knowledge [were] all normal." Dr. Beall diagnosed myelopathic monoparesis (a weak limb) in the lower extremity; ordered testing, including an MRI of her brain; instructed her to complete a headache diary; and recommended a headache-minimizing diet. The April 2008 MRI of Curler's brain produced adequate images revealing no aneurysm. Later that month, Curler was prescribed Vicodin.

A May 2008 MRI of the neck revealed a herniated disc that caused mild-to-moderate spinal narrowing. A follow-up September 2008 cervical MRI confirmed the herniated disc with some mild cord compression but no significant cord swelling. In August 2008, Curler reported "fatigue at times" to Dr. Ingram.

Also in September 2008, Curler returned to Dr. Beall with a complaint of five headaches in the preceding month. She reported that three of the headaches "put her down" such that she

could not function for a full day. Dr. Beall again recommended no treatment beyond initiating low doses of the medications Pamelor and Klonopin. A month later, Dr. Beall noted that the frequency of Curler's headaches had decreased. Moreover, her "myelopathic monoparesis [had] gotten significantly better." In November 2008, Dr. Beall noted that Curler's gait and station were normal, muscle tone was normal, and that her "myelopathic quadriparesis is even further resolved."

In January 2009, Dr. Beall first mentioned that Curler complained of fatigue, which had lasted for three days. After a March 2009 visit, Dr. Beall noted no complaint of fatigue and that Curler had complete resolution of her myelopathic quadriparesis. In August 2009, Curler reported at her last documented visit to Dr. Beall that none of her moderate headaches "put her down." The physical exams that Dr. Beall conducted each of the seven times that he saw Curler between March 2008 and August 2009 revealed normal gait and tone in the extremities and at most moderate muscle weakness.

Charles Guidot, M.D., RPVI (a circulatory system specialist), reported in November 2009 that Curler's clinical data included headaches and neck pain but not fatigue. In December 2009, Curler reported "some fatigue" to Dr. Ingram, but later that month denied fatigue altogether to Sanjeev Prakash, M.D., a referral from Dr. Beall. Dr. Prakash's physical exam revealed normal gait and tone in the extremities and at most moderate muscle weakness.

In January 2010, Dr. Prakash attributed Curler's complaints of fatigue, muscle pain, rash, and anemia to systemic lupus erythematosus ("lupus"). Dr. Prakash, like the other doctors, recommended no specific treatment for fatigue and imposed no limitations on her activity.

**Curler's Activity Report and Hearing Testimony**

In her daily activity report, Curler indicated that she takes care of her pets and her children with no help from others, but also stated that her children "do a lot on their own." She indicated that she is able to do her own personal care. Curler further stated she does not need reminders, is able to prepare all kinds of meals on a daily basis, is able to do "light housekeeping," is able to drive alone, goes outside for one half hour each day, and shops in stores for up to two hours at a time. Curler handles her own finances, talks with others, visits family, and goes to appointments on her own.

At Curler's administrative hearing in May 2010, she testified that she had severe back and leg pain that lasted for up to five days before receding for days at a time; the pain prevented her from standing for more than 10 minutes and sitting for more than 15 minutes without changing positions. When asked about her symptoms from lupus, Curler responded that she has "extreme fatigue" and "bad headaches." She estimated getting such severe headaches about five days out of each month and that when they occur, she "ha[s] to lay down and keep quiet and take some aspirin until [the headache] goes away." Curler further testified that she "usually just take[s] over-the-counter [medicine], like aspirin or Extra Strength Tylenol" for her headaches, but if that doesn't help, she will sometimes take Vicodin. She testified to suffering from extreme, lupus-induced fatigue "[a]t least three quarters of the month," which affected her ability to do chores around the house and caused her to rest every five to ten minutes or lie down extensively.

## II. PROCEDURAL HISTORY

After a hearing in June 2010, the administrative law judge ("ALJ") issued a decision finding Curler not disabled. The Appeals Council denied her request for review. In 2011, Curler

filed this action in district court for judicial review of the ALJ's decision. The magistrate judge recommended that the district court remand the case for an award of benefits, but the district court rejected the magistrate judge's recommendation, affirmed the Commissioner's final decision, and entered judgment for the Commissioner.

**ALJ Findings**

The ALJ applied the Commissioner's five-step disability analysis to Curler's claim, *see e.g.*, *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 803-04 (6th Cir. 2008), and found at step one that she had not engaged in substantial gainful activity since July 17, 2008, the application date. At step two, the ALJ attributed the following "severe impairments" to Curler: degenerative disc disease; obesity; systemic lupus erythematosus; depression; anxiety; and substance addiction, in remission. At step three, the ALJ found no evidence that Curler's combination of impairments met or equaled one of the listings in the regulations. At step four, the ALJ found that Curler was unable to perform any past relevant work. At step five, the ALJ found that Curler retained the RFC to perform a limited range of light work. Therefore, the ALJ concluded that Curler was not disabled.

**District Court Decision**

The district court held that the ALJ appropriately applied the treating physician rule to Dr. Ingram's March 2010 evaluation. It further held that the ALJ adequately accommodated Curler's lupus-related limitations by identifying functional restrictions beyond those Dr. Thompson had suggested. The district court also declined to reassess the ALJ's analysis of Curler's credibility.

### III.  STANDARD OF REVIEW

"We must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record."  *Colvin v. Barnhart*, 475 F.3d 727, 729 (6th Cir. 2007) (quotation marks omitted).  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"  42 U.S.C. § 405(g).

### IV.  DISCUSSION

Curler argues that the ALJ (1) did not afford controlling or substantial weight to her treating psychiatrist's opinions, (2) erred in determining her RFC, and (3) did not adequately consider her subjective complaints regarding the intensity and persistence of her symptoms.

### 1.  Treating Physician

Curler contends that the ALJ failed to give controlling weight to the opinions of Dr. Ingram, her treating psychiatrist, and failed to state what weight was given.  Under the pertinent regulations, more weight is generally given to the opinion of a treating physician.  *See* 20 C.F.R. § 404.1527(c)(2).  As long as the treating physician's opinion regarding the nature and severity of the claimant's impairment "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," it will be given controlling weight.  *Id.*  If the ALJ chooses not to give the treating physician's opinion controlling weight, he or she must determine what weight to give it by looking at various factors, including the length of the treatment relationship and the frequency of examination; the nature and extent of the treatment relationship; the supportability of the opinion; its consistency with the record as a whole; the specialization of the physician or doctor rendering the opinion; and other factors that support or contradict the opinion.  *Id.* § 404.1527(c)(2)–(6).

However, "a treating physician's opinion is only entitled to such . . . deference when it is a *medical opinion.*" *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 492-93 (6th Cir. 2010). "If the treating physician instead submits an opinion on an issue reserved to the Commissioner— such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors—his decision need only 'explain the consideration given to the treating source's opinion.'" *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 505 (6th Cir. 2013) (quoting Soc. Sec. Rul. 96–5p). The opinion, however, "is not entitled to any particular weight." *Turner*, 381 F. App'x at 493.

The ALJ took issue with the incomplete and unsupported answers Dr. Ingram provided in the state agency's form that sought his input on Curler's mental abilities in a workplace setting. The ALJ "considered the form in light of" the treatment records from "the facility[]," i.e., Michigan Psychiatric and Behavioral Associates, where Curler "ha[d] been treated by Dr. Ingram and licensed social workers," and found Dr. Ingram's opinion "not controlling on the issue of disability." In reaching this conclusion, the ALJ explained that "the form consists solely of checked [boxes], with no explanation or reference to treatment records" and, separately, that "the treatment records . . . do not support the opinion." Dr. Ingram's own clinical notes from September 2007 (the start of Curler's treatment) to December 2009 (the date of her last visit) provided the ALJ a "thorough chronological picture." After giving "significant weight" to these treatment records, the examination reports of Ms. Glowicki and Dr. Date, and the expert opinion of Dr. DeLoach, the ALJ concluded Curler's depression, anxiety, and substance-addiction disorders were severe but not disabling.

The form that Dr. Ingram filled out for the state agency in March 2010 is not a clinical note, nor does it document a contemporaneous examination of the patient; it is a questionnaire

that provides the state agency with "information about how [a] patient's diagnosed medical condition[s]" affect her ability to function "in a regular work-setting on a day-to-day basis." Since the solicited information is not a medical opinion, but rather an opinion as to Curler's inability to work, it is not entitled to controlling weight. *See Johnson*, 535 F. App'x at 505. Nor is it entitled to any particular weight. *See Turner*, 381 F. App'x at 493. Despite prompts following each section of the form instructing that "supportive medical findings [be identified]" and that "pertinent clinical notes or test results [be attached]," Dr. Ingram left blank every available area for remarks and universally failed to include any references, notes, or test results. The ALJ adequately explained his consideration of the March 2010 evaluation and his reasons for discounting it, and did so based not only on substantial evidence from other sources, but also on Dr. Ingram's records over the course of Curler's treatment.

Curler asserts in her brief that "significant weight [was not given] to Dr. Ingram's opinions, [because those] opinions indicated [Curler] was disabled." However, disability determinations are the prerogative of the Commissioner. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To the extent Dr. Ingram makes statements that Curler is disabled, those statements are given no special significance. *See* 20 C.F.R. § 416.927(d). Outside of the March 2010 opinion, the ALJ expressly ascribed "significant weight" to Dr. Ingram's treatment records. Viewing those records, substantial evidence exists to support the ALJ's decision. In September 2007, Dr. Ingram observed that Curler was "alert and oriented," that her immediate, short-term and long-term memory was "intact," that her concentration was normal, and that she had a general fund of knowledge. He assessed a fair prognosis. The next month, Curler told Dr. Ingram that her depression was at a severity level of five on a ten-point scale. Dr. Ingram noted Curler's mood was somewhat anxious, but her thoughts were clear and organized, and her affect

was appropriate. In January 2008, Dr. Ingram noted that her speech was normal, affect was appropriate, thought content was normal, thought process was coherent, attention was normal, perception was normal, intellect was average, insight was good, and judgment was appropriate. He also discontinued her prescription medication and referred her to therapy. In May 2008, Dr. Ingram noted that Curler was off anti-depressant medication and denied feeling depressed or fatigued. During the visit, Curler's actions and requests led Dr. Ingram to believe that most of her motivations for attending therapy were related to obtaining approval for bariatric surgery. This comment is reflected in the clinical note. Curler described her mood to Dr. Ingram as "okay" in March 2009, "a little bit" anxious in May 2009, "okay" and "a little bit on the low side" in August 2009, and in December 2009 she told him her mood was "fair" after her August 2009 bariatric lap band surgery. Dr. Ingram repeatedly noted Curler's denial of psychosis or hallucinations and her ordered speech and thought.

Even assuming Dr. Ingram's treatment notes support a finding of disability, such opinions are inconsistent with other substantial evidence in the record. Several therapists and doctors documented that Curler exhibited at most only mild or moderate mental impairments in certain limited areas of functioning, assigned GAF scores above 50, and found no incidents of decompensation. Because the ALJ gave "good reasons" for the weight assigned to the treating physician's various opinions—medical or not—the ALJ did not err. *See* 20 C.F.R. § 404.1527(c)(2); *see also Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 652 (6th Cir. 2006) ("[T]his court has consistently stated that the Secretary is not bound by the treating physician's opinions, and that such opinions receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence") (citation omitted).

**2. Physical RFC Findings**

As a threshold matter, Dr. Prakash's two February 2010 notes and one May 2010 note cannot be considered part of the record because Curler submitted those notes for the first time to the Appeals Council in support of her request for review of the ALJ's decision. We have repeatedly refused to consider evidence submitted after the ALJ issued his decision when reviewing that decision for substantial evidence under 42 U.S.C. § 405(g). *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).

Curler argues that the ALJ erred in adopting a RFC that failed to account for her symptoms of fatigue and headache (attributed to lupus), and her symptoms of back pain (attributed to degenerative disc disease). The ALJ limited Curler to work that does not require exertion above the light level and restricted her postural positions to accommodate these impairments. The ALJ determined that had the severity of Curler's back pain and lupus-induced fatigue and headaches truly precluded all employment, the medical records would have documented more specific and frequent complaints of fatigue, more extreme complaints of headaches, and more aggressive treatment or more urgent complaints from Curler. The ALJ also added that a vocational expert identified jobs in the national economy that Curler could perform even if she had been limited to sedentary work, as opposed to light work.

Substantial evidence supports the ALJ's RFC finding with respect to Curler's lupus-related symptoms. Curler contends that the ALJ unreasonably relied on the limitations found by Dr. Thompson because Dr. Thompson reviewed the records in January 2008, while Curler was first diagnosed with lupus by Dr. Prakash in January 2010. Dr. Thompson's opinion concluded that Curler could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for at least

2 hours per workday, sit for about 6 hours per workday, and occasionally climb stairs or ramps, balance, stoop, kneel, crouch, and crawl. However, the ALJ limited Curler to no climbing, balancing, kneeling, crouching, or crawling—a finding more restrictive than Dr. Thompson's opinion. This demonstrates that the ALJ accounted for Curler's lupus-related limitations. The ALJ also included lupus among Curler's severe impairments, specifically discussed Curler's account of lupus-induced fatigue, and limited Curler to among the simplest, least-taxing work specifically to accommodate the effect of lupus on Curler's exertional capacity.

Moreover, substantial evidence supports the ALJ's RFC finding with respect to Curler's back-related symptoms. The ALJ reasonably accommodated Curler's back impairment by restricting her to light work and sharply reduced postural requirements. Had Curler suffered from severe pain associated with her back condition, the medical records would have revealed severe back or leg abnormalities, abnormal functioning on physical exams, recommendations for more aggressive treatment, and more significant doctor-recommended functional limitations. *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 727 (6th Cir. 2013) ("The ALJ's finding [that the claimant has the physical RFC for the full range of light work] is supported by the evidence in the record that his treatment was minimal and conservative during the period at question . . . .").

**3. Claimant Credibility**

The ALJ determined that Curler's testimony regarding the intensity and persistence of her symptoms was not fully credible because it did not align with the clinical findings and medical evidence. Curler argues that the objective medical evidence confirmed her symptoms.

Credibility determinations regarding the applicant's subjective complaints rest with the ALJ and are afforded great weight and deference as long as they are supported by substantial

evidence. *See Torres v. Comm'r of Soc. Sec.*, 490 F. App'x 748, 755 (6th Cir. 2012). In assessing an individual's credibility, "the ALJ must [first] determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged." *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370, 371 (6th Cir. 2011). The ALJ made this finding here. Next, the ALJ must evaluate the intensity, persistence, and functional limitations of the symptoms by considering objective medical evidence, as well as: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions. 20 C.F.R. § 404.1529(c)(1)-(3).

The ALJ's credibility determination was supported by substantial evidence. Curler testified that lupus-induced fatigue forced her to break from household chores every five to ten minutes or lie down extensively three out of four days. Yet, despite seeing Curler seven times between March 2008 and August 2009, Dr. Beall mentioned that Curler complained of fatigue only once, in January 2009, and in response he recommended only blood-work and a follow-up in a month. Dr. Guidot reported in November 2009 that Curler's clinical data included headaches and neck pain, but not fatigue. And in December 2009, Curler reported "some fatigue" to Dr. Ingram, but denied fatigue altogether to Dr. Prakash.

Dr. Prakash's January 2010 note—the most recent medical evidence of physical functioning that Curler submitted to the ALJ—formally attributed Curler's complaint of fatigue to lupus and prescribed testing, blood-work, and a follow-up visit in two months. But

importantly, no doctor described complaints of the type of debilitating fatigue to which Curler testified, recommended any specific treatment for fatigue, or imposed any limitations. *See Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 596 (6th Cir. 2005) ("a lack of physical restrictions [imposed by a doctor] constitutes substantial evidence for a finding of non-disability").

Indeed, the vagueness of the doctors' description of Curler's complaints of fatigue contrasts with the specificity of their description of her complaints of headaches, which generally were subdued. Curler usually described no more than "moderate" headaches to her doctors, who never formally attributed them to a medical condition. Curler testified in May 2010 that she usually took Tylenol or aspirin, or sometimes Vicodin, to address severe lupus-induced headaches that occurred five days a month. But Curler told Dr. Beall in March 2008 that the severity of her daily headache was only 1 out of 10. In September 2008, Dr. Beall prescribed low doses of medications Pamelor and Klonopin after Curler complained of five headaches in the preceding month, three of which "put her down where she could not function." But by October 2008, the headaches occurred less frequently. And by August 2009, Curler reported to Dr. Beall that none of her moderate headaches "put her down." Most revealingly, Curler admitted that she addressed the headaches mostly with routine, non-prescription medications.

Curler argues that the ALJ was obligated to accept her testimony about debilitating back and leg pain because she repeatedly complained of back pain, her doctors prescribed medication, and the May 2008 and September 2008 MRIs revealed moderately herniated disks, mild stenosis (narrowing), and mild cord compression.

However, Curler's testimony describing her back pain contrasted starkly with the medical evidence. Curler testified that severe back and leg pain lasting up for up to five days, before

receding for days at a time, prevented her from standing for more than 10 minutes and sitting for more than 15 minutes without changing positions. But no doctor ordered any MRIs of Curler's lower back. Meanwhile, the MRIs of Curler's cervical spine revealed no severe or significant abnormalities. Thus, the objective medical testing showed that Curler had some problems with her cervical spine, but did not substantiate the debilitating limitations she described in either her cervical or lumbar spines. *See* 20 C.F.R. § 416.929(c)(2).

Clinical examinations also failed to substantiate Curler's complaints of debilitating back problems. As the ALJ explained, all seven of the physical exams Dr. Beall conducted between March 2008 and August 2009, as well as Dr. Prakash's December 2009 exam, revealed normal gait and tone in the extremities and at most moderate muscle weakness. *See Carreon v. Massanari*, 51 F. App'x 571, 574 (6th Cir. 2002) (finding complaints of back pain discredited in part by unremarkable physical examinations). In August 2007, Curler was prescribed hydrocodone and tramadol to address her low back pain; in April 2008, she was prescribed Vicodin. All three medications are used to treat only moderate to moderately severe pain. *See Johnson v. Astrue*, 628 F.3d 991, 994 n.2 (8th Cir. 2011); *Wall v. Astrue*, 561 F.3d 1048, 1060 n.19 (10th Cir. 2009); *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 421 n.9 (6th Cir. 2013). We have generally found such modest treatment to be "inconsistent with a finding of total disability." *Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 (6th Cir. 2011).

## 4. Request for Remand

Curler also requests a remand under 42 U.S.C. § 405(g). She develops no argument to support a remand, and thus the request is waived. *See United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

Regardless, under § 405(g), Curler bears the burden of establishing that a remand is warranted. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). A remand pursuant to sentence six of 42 U.S.C. § 405(g) is appropriate "only if the evidence is 'new' and 'material' and 'good cause' is shown for the failure to present the evidence to the ALJ." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010).

We assume that Curler seeks remand for the ALJ to consider Dr. Prakash's February and May 2010 notes, which Curler submitted for the first time to the Appeals Council. Curler has not shown good cause, or attempted to show good cause, for failing to submit these notes to the ALJ before he issued his decision in June 2010. Thus, her request for remand fails.

**AFFIRMED**.